Justice ALITO delivered the opinion of the Court.
*739 We are asked in this case to extend Bivens v. Six Unknown Fed. Narcotics Agents , 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and create a damages remedy for a cross-border shooting. As we have made clear in many prior cases, however, the Constitution's separation of powers requires us to exercise caution before extending Bivens to a new "context," and a claim based on a cross-border shooting arises in a context that is markedly new. Unlike any previously recognized Bivens claim, a cross-border shooting claim has foreign relations and national security implications. In addition, Congress has been notably hesitant to create claims based on allegedly tortious conduct abroad. Because of the distinctive characteristics of cross-border shooting claims, we refuse to extend Bivens into this new field.
I
The facts of this tragic case are set forth in our earlier opinion in this matter, *740 Hernández v. Mesa , 582 U.S. ----, 137 S.Ct. 2003, 198 L.Ed.2d 625 (2017) (per curiam ). Sergio Adrián Hernández Güereca, a 15-year-old Mexican national, was with a group of friends in a concrete culvert that separates El Paso, Texas, from Ciudad Juarez, Mexico. The border runs through the center of the culvert, which was designed to hold the waters of the Rio Grande River but is now largely dry. Border Patrol Agent Jesus Mesa, Jr., detained one of Hernández's friends who had run onto the United States' side of the culvert. After Hernández, who was also on the United States' side, ran back across the culvert onto Mexican soil, Agent Mesa fired two shots at Hernández; one struck and killed him on the other side of the border.
Petitioners and Agent Mesa disagree about what Hernández and his friends were doing at the time of shooting. According to petitioners, they were simply playing a game, running across the culvert, touching the fence on the U.S. side, and then running back across the border. According to Agent Mesa, Hernández and his friends were involved in an illegal border crossing attempt, and they pelted him with rocks.[1]
The shooting quickly became an international incident, with the United States and Mexico disagreeing about how the matter should be handled. On the United States' side, the Department of Justice conducted an investigation. When it finished, the Department, while expressing regret over Hernández's death, concluded that Agent Mesa had not violated Customs and Border Patrol policy or training, and it declined to bring charges or take other action against him. Mexico was not and is not satisfied with the U.S. investigation. It requested that Agent Mesa be extradited to face criminal charges in a Mexican court, a request that the United States has denied.
Petitioners, Hernández's parents, were also dissatisfied
and therefore brought suit for damages in the United States District Court for the Western District of Texas. Among other claims, they sought recovery of damages under Bivens , alleging that Mesa violated Hernández's Fourth and Fifth Amendment rights. The District Court granted Mesa's motion to dismiss, and the Court of Appeals for the Fifth Circuit sitting en banc has twice affirmed this dismissal.
On the first occasion, the court held that Hernández was not entitled to Fourth Amendment protection because he was "a Mexican citizen who had no 'significant voluntary connection' to the United States" and "was on Mexican soil at the time he was shot." Hernandez v. United States , 785 F.3d 117, 119 (C.A.5 2015) (per curiam ). It further concluded that Mesa was entitled to qualified immunity on petitioners' Fifth Amendment claim. Id., at 120.
After granting review, we vacated the Fifth Circuit's decision and remanded the case, instructing the court "to consider how the reasoning and analysis" of Ziglar v. Abbasi , 582 U.S. ----, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017), our most recent explication of Bivens , "[might] bear on this case." Hernández , 582 U.S., at ----, 137 S.Ct., at 2006. We found it "appropriate for the Court of Appeals, rather than this Court, to address the Bivens question in the first instance." Ibid. And with the Bivens issue unresolved, we thought it "imprudent" to resolve the "sensitive"
*741 question whether the Fourth Amendment applies to a cross-border shooting. Ibid. In addition, while rejecting the ground on which the Court of Appeals had held that Agent Mesa was entitled to qualified immunity, we declined to decide whether he was entitled to qualified immunity on a different ground or whether petitioners' claim was cognizable under the Fifth Amendment. Id., at ---- - ----, 137 S.Ct., at 2006-2008
On remand, the en banc Fifth Circuit evaluated petitioners' case in light of Abbasi and refused to recognize a Bivens claim for a cross-border shooting. 885 F.3d 811 (C.A.5 2018). The court reasoned that such an incident presents a " 'new context' " and that multiple factors-including the incident's relationship to foreign affairs and national security, the extraterritorial aspect of the case, and Congress's "repeated refusals" to create a damages remedy for injuries incurred on foreign soil-counseled against an extension of Bivens . 885 F.3d at 816-823.
We granted certiorari, 587 U.S. ----, 139 S.Ct. 2636, 204 L.Ed.2d 282 (2019), and now affirm.
II
In Bivens v. Six Unknown Fed. Narcotics Agents , 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619, the Court broke new ground by holding that a person claiming to be the victim of an unlawful arrest and search could bring a Fourth Amendment claim for damages against the responsible agents even though no federal statute authorized such a claim. The Court subsequently extended Bivens to cover two additional constitutional claims: in Davis v. Passman , 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), a former congressional staffer's Fifth Amendment claim of dismissal based on sex, and in Carlson v. Green , 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), a federal prisoner's Eighth Amendment claim for failure to provide adequate medical treatment. After those decisions, however, the Court changed course.
Bivens , Davis , and Carlson were the products of an era when the Court routinely inferred "causes of action" that were "not explicit" in the text of the provision that was allegedly violated. Abbasi , 582 U.S., at ----, 137 S.Ct., at 1855. As Abbasi recounted:
"During this 'ancien regime ,' ... the Court assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose .... Thus, as a routine matter with respect to statutes, the Court would imply causes of action not explicit in the statutory text itself." Ibid. (quoting Alexander v. Sandoval , 532 U.S. 275, 287, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ; J. I. Case Co. v. Borak , 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) ).
Bivens extended this practice to claims based on the Constitution itself. 582 U.S., at ----, 137 S.Ct., at 1855 ; Bivens , 403 U.S. at 402, 91 S.Ct. 1999 (Harlan, J., concurring in judgment) (Court can infer availability of damages when, "in its view, damages are necessary to effectuate" the "policy underpinning the substantive provisio[n]").
In later years, we came to appreciate more fully the tension between this practice and the Constitution's separation of legislative and judicial power. The Constitution grants legislative power to Congress; this Court and the lower federal courts, by contrast, have only "judicial Power." Art. III, § 1. But when a court recognizes an implied claim for damages on the ground that doing so furthers the "purpose" of the law, the court risks arrogating legislative power. No law " 'pursues *742 its purposes at all costs.' " American Express Co. v. Italian Colors Restaurant , 570 U.S. 228, 234, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013) (quoting Rodriguez v. United States , 480 U.S. 522, 525-526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (per curiam )). Instead, lawmaking involves balancing interests and often demands compromise. See Board of Governors, FRS v. Dimension Financial Corp. , 474 U.S. 361, 373-374, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986). Thus, a lawmaking body that enacts a provision that creates a right or prohibits specified conduct may not wish to pursue the provision's purpose to the extent of authorizing private suits for damages. For this reason, finding that a damages remedy is implied by a provision that makes no reference to that remedy may upset the careful balance of interests struck by the lawmakers. See ibid.
This problem does not exist when a common-law court, which exercises a degree of lawmaking authority, fleshes out the remedies available for a common-law tort. Analogizing Bivens to the work of a common-law court, petitioners and some of their amici make much of the fact that common-law claims against federal officers for intentional torts were once available. See, e.g. , Brief for Petitioners 10-20. But Erie R. Co. v. Tompkins , 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), held that "[t]here is no federal general common law," and therefore federal courts today cannot fashion new claims in the way that they could before 1938. See Alexander , 532 U.S. at 287, 121 S.Ct. 1511 (" 'Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals' ").
With the demise of federal general common law, a federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress, see id., at 286, 121 S.Ct. 1511 ("private rights of action to enforce federal law must be created by Congress"), and no statute expressly creates a Bivens remedy. Justice Harlan's Bivens concurrence argued that this power is inherent in the grant of federal question jurisdiction, see 403 U.S. at 396, 91 S.Ct. 1999 (majority opinion); id. , at 405, 91 S.Ct. 1999 (opinion of Harlan, J.), but our later cases have demanded a clearer manifestation of congressional intent, see Abbasi , 582 U.S., at ---- - ----, 137 S.Ct., at 1856-1858.
In both statutory and constitutional cases, our watchword is caution. For example, in Jesner v. Arab Bank, PLC , 584 U.S. ----, ---- - ----, 138 S.Ct. 1386, 1391-1403, 200 L.Ed.2d 612 (2018) we expressed doubt about our authority to recognize any causes of action not expressly created by Congress. See also Abbasi, 582 U.S., at ----, 137 S.Ct., at 1856 ("If the statute does not itself so provide, a private cause of action will not be created through judicial mandate"). And we declined to recognize a claim against a foreign corporation under the Alien Tort Statute. Jesner , 584 U.S., at ----, 138 S.Ct., at 1408.
In constitutional cases, we have been at least equally reluctant to create new causes of action. We have recognized that Congress is best positioned to evaluate "whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government" based on constitutional torts. Abbasi , 582 U.S., at ----, 137 S.Ct., at 1856. We have stated that expansion of Bivens is "a 'disfavored' judicial activity," 582 U.S., at ----, 137 S.Ct., at 1857 (quoting Ashcroft v. Iqbal , 556 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ), and have gone so far as to observe that if "the Court's three Bivens cases [had] been ... decided today," it is doubtful that we would have *743 reached the same result, 582 U.S., at ----, 137 S.Ct., at 1856. And for almost 40 years, we have consistently rebuffed requests to add to the claims allowed under Bivens . See 582 U.S., at ----, 137 S.Ct., at 1863-1864 ; Minneci v. Pollard , 565 U.S. 118, 132 S.Ct. 617, 181 L.Ed.2d 606 (2012) ; Wilkie v. Robbins , 551 U.S. 537, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) ; Correctional Services Corp. v. Malesko , 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) ; FDIC v. Meyer , 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) ; Schweiker v. Chilicky , 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) ; United States v. Stanley , 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) ; Chappell v. Wallace , 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) ; Bush v. Lucas , 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983).
When asked to extend Bivens , we engage in a two-step inquiry. We first inquire whether the request involves a claim that arises in a "new context" or involves a "new category of defendants." Malesko , 534 U.S. at 68, 122 S.Ct. 515. And our understanding of a "new context" is broad. We regard a context as "new" if it is "different in a meaningful way from previous Bivens cases decided by this Court." Abbasi , 582 U.S., at ----, 137 S.Ct., at 1859.
When we find that a claim arises in a new context, we proceed to the second step and ask whether there are any " ' "special factors [that] counse[l] hesitation" ' " about granting the extension. Id. , at ----, 137 S.Ct., at 1857 (quoting Carlson , 446 U.S. at 18, 100 S.Ct. 1468, in turn quoting Bivens , 403 U.S. at 396, 91 S.Ct. 1999 ). If there are-that is, if we have reason to pause before applying Bivens in a new context or to a new class of defendants-we reject the request.
We have not attempted to "create an exhaustive list" of factors that may provide a reason not to extend Bivens , but we have explained that "central to [this] analysis" are "separation-of-powers principles." Abbasi , 582 U.S., at ----, 137 S.Ct., at 1857. We thus consider the risk of interfering with the authority of the other branches, and we ask whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," id., at ----, 137 S.Ct., at 1858, and "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed," id., at ----, 137 S.Ct., at 1858
III
A
The Bivens claims in this case assuredly arise in a new context. Petitioners contend that their Fourth and Fifth Amendment claims do not involve a new context because Bivens and Davis involved claims under those same two amendments, but that argument rests on a basic misunderstanding of what our cases mean by a new context. A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized. Compare Carlson , 446 U.S. at 16-18, 100 S.Ct. 1468 (allowing Bivens remedy for an Eighth Amendment claim for failure to provide adequate medical treatment), with Malesko , 534 U.S. at 71-74, 122 S.Ct. 515 (declining to create a Bivens remedy in similar circumstances because the suit was against a private prison operator, not federal officials). And once we look beyond the constitutional provisions invoked in Bivens , Davis , and the present case, it is glaringly obvious that petitioners' claims involve a new context, i.e. , one that is meaningfully different.
*744 Bivens concerned an allegedly unconstitutional arrest and search carried out in New York City, 403 U.S. at 389, 91 S.Ct. 1999 ; Davis concerned alleged sex discrimination on Capitol Hill, 442 U.S. at 230, 99 S.Ct. 2264. There is a world of difference between those claims and petitioners' cross-border shooting claims, where "the risk of disruptive intrusion by the Judiciary into the functioning of other branches" is significant. Abbasi , 582 U.S., at ----, 137 S.Ct., at 1860 ; see Parts III-B and III-C, infra .
Because petitioners assert claims that arise in a new context, we must proceed to the next step and ask whether there are factors that counsel hesitation. As we will explain, there are multiple, related factors that raise warning flags.
B
The first is the potential effect on foreign relations. "The political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." Jesner , 584 U.S., at ----, 138 S.Ct., at 1403. Indeed, we have said that "matters relating 'to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.' " Haig v. Agee , 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (quoting Harisiades v. Shaughnessy , 342 U.S. 580, 589, 72 S.Ct. 512, 96 L.Ed. 586 (1952) ). "Thus, unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in [these matters]." Department of Navy v. Egan , 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). We must therefore be especially wary before allowing a Bivens remedy that impinges on this arena.
A cross-border shooting is by definition an international incident; it involves an event that occurs simultaneously in two countries and affects both countries' interests. Such an incident may lead to a disagreement between those countries, as happened in this case.
The United States, through the Executive Branch, which has " 'the lead role in foreign policy,' " Medellín v. Texas , 552 U.S. 491, 524, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (alteration omitted), has taken the position that this incident should be handled in a particular way-namely, that Agent Mesa should not face charges in the United States nor be extradited to stand trial in Mexico. As noted, the Executive decided not to take action against Agent Mesa because it found that he "did not act inconsistently with [Border Patrol] policy or training regarding use of force." DOJ Press Release. We presume that Border Patrol policy and training incorporate both the Executive's understanding of the Fourth Amendment's prohibition of unreasonable seizures and the Executive's assessment of circumstances at the border. Thus, the Executive judged Agent Mesa's conduct by what it regards as reasonable conduct by an agent under the circumstances that Mesa faced at the time of the shooting, and based on the application of those standards, it declined to prosecute. The Executive does not want a Mexican criminal court to judge Agent Mesa's conduct by whatever standards would be applicable under Mexican law; nor does it want a jury in a Bivens action to apply its own understanding of what constituted reasonable conduct by a Border Patrol agent under the circumstances of this case. Such a jury determination, the Executive claims, would risk the " ' "embarrassment of our government abroad" through "multifarious pronouncements by various departments on one question." ' " Brief for United States as Amicus Curiae 18 (quoting Sanchez-Espinoza v. Reagan , 770 F.2d 202, 209 (C.A.D.C. 1985) (Scalia, J.)).
*745 The Government of Mexico has taken a different view of what should be done. It has requested that Agent Mesa be extradited for criminal prosecution in a Mexican court under Mexican law, and it has supported petitioners' Bivens suit. In a brief filed in this Court, Mexico suggests that shootings by Border Patrol agents are a persistent problem and argues that the United States has an obligation under international law, specifically Article 6(1) of the International Covenant on Civil and Political Rights, Dec. 19, 1966, S. Treaty Doc. No. 95-20, 999 U. N. T. S. 174, to provide a remedy for the shooting in this case. Brief for Government of United Mexican States as Amicus Curiae 2, 20-22. Mexico states that it "has a responsibility to look after the well-being of its nationals" and that "it is a priority to Mexico to see that the United States provides adequate means to hold the agents accountable and to compensate the victims." Id. , at 3.
Both the United States and Mexico have legitimate and important interests that may be affected by the way in which this matter is handled. The United States has an interest in ensuring that agents assigned the difficult and important task of policing the border are held to standards and judged by procedures that satisfy United States law and do not undermine the agents' effectiveness and morale. Mexico has an interest in exercising sovereignty over its territory and in protecting and obtaining justice for its nationals. It is not our task to arbitrate between them.
In the absence of judicial intervention, the United States and Mexico would attempt to reconcile their interests through diplomacy-and that has occurred. The broad issue of violence along the border, the occurrence of crossborder shootings, and this particular matter have been addressed through diplomatic channels. In 2014, Mexico and the United States established a joint Border Violence Prevention Council, and the two countries have addressed cross-border shootings through the United States-Mexico bilateral Human Rights Dialogue.[2] Following the Justice Department investigation in the present case, the United States reaffirmed its commitment to "work with the Mexican government within existing mechanisms and agreements to prevent future incidents." DOJ Press Release.
For these reasons, petitioners' assertion that their claims have "nothing to do with the substance or conduct of U.S. foreign ... policy," Brief for Petitioners 29, is plainly wrong.[3]
C
Petitioners are similarly incorrect in deprecating the Fifth Circuit's conclusion *746 that the issue here implicates an element of national security.
One of the ways in which the Executive protects this country is by attempting to control the movement of people and goods across the border, and that is a daunting task. The United States' border with Mexico extends for 1,900 miles, and every day thousands of persons and a large volume of goods enter this country at ports of entry on the southern border.[4] The lawful passage of people and goods in both directions across the border is beneficial to both countries.
Unfortunately, there is also a large volume of illegal
cross-border traffic. During the last fiscal year, approximately 850,000 persons were apprehended attempting to enter the United States illegally from Mexico,[5] and large quantities of drugs were smuggled across the border.[6] In addition, powerful criminal organizations operating on both sides of the border present a serious law enforcement problem for both countries.[7]
On the United States' side, the responsibility for attempting to prevent the illegal entry of dangerous persons and goods rests primarily with the U.S. Customs and Border Protection Agency, and one of its main responsibilities is to "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States." 6 U.S.C. § 211(c)(5). While Border Patrol agents often work miles from the border, some, like Agent Mesa, are stationed right at the border and have the responsibility of attempting to prevent illegal entry. For these reasons, the conduct of agents positioned at the border has a clear and strong connection to national security, as the Fifth Circuit understood. 885 F.3d at 819.
Petitioners protest that " 'shooting people who are just walking down a street in Mexico' " does not involve national security, Brief for Petitioners 28, but that misses the point. The question is not whether national security requires such conduct-of course, it does not-but whether the Judiciary should alter the framework established by the political branches for addressing cases in which it is alleged that lethal force was unlawfully employed by an agent at the border. Cf. Abbasi , 582 U.S., at ----, 137 S.Ct., at 1861 (explaining that "[n]ational-security policy is the prerogative of the Congress and President").
We have declined to extend Bivens where doing so would interfere with the *747 system of military discipline created by statute and regulation, see Chappell , 462 U.S. 296, 103 S.Ct. 2362 ; Stanley , 483 U.S. 669, 107 S.Ct. 3054, and a similar consideration is applicable here. Since regulating the conduct of agents at the border unquestionably has national security implications, the risk of undermining border security provides reason to hesitate before extending Bivens into this field. See Abbasi , 582 U.S., at ----, 137 S.Ct., at 1861 ("Judicial inquiry into the national-security realm raises 'concerns for the separation of powers' " (quoting Christopher v. Harbury , 536 U.S. 403, 417, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) )).
D
Our reluctance to take that step is reinforced by our survey of what Congress has done in statutes addressing related matters. We frequently "loo[k] to analogous statutes for guidance on the appropriate boundaries of judge-made causes of action." Jesner , 584 U.S., at ----, 138 S.Ct., at 1403 (opinion of Kennedy, J.). When foreign relations are implicated, it "is even more important ... 'to look for legislative guidance before exercising innovative authority over substantive law.' " Id., at ----, 138 S.Ct., at 1403 (quoting Sosa v. Alvarez-Machain , 542 U.S. 692, 726, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) ). Accordingly, it is "telling," Abbasi , 582 U.S., at ----, 137 S.Ct., at 1862, that Congress has repeatedly declined to authorize the award of damages for injury inflicted outside our borders.
A leading example is 42 U.S.C. § 1983, which permits the recovery of damages for constitutional violations by officers acting under color of state law. We have described Bivens as a "more limited" "federal analog" to § 1983. Hartman v. Moore , 547 U.S. 250, 254, n. 2, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). It is therefore instructive that Congress chose to make § 1983 available only to "citizen[s] of the United States or other person[s] within the jurisdiction thereof." It would be "anomalous to impute ... a judicially implied cause of action beyond the bounds [Congress has] delineated for [a] comparable express caus[e] of action." Blue Chip Stamps v. Manor Drug Stores , 421 U.S. 723, 736, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Thus, the limited scope of § 1983 weighs against recognition of the Bivens claim at issue here.
Section 1983's express limitation to the claims brought by citizens and persons subject to United States jurisdiction is especially significant, but even if this explicit limitation were lacking, we would presume that § 1983 did not apply abroad. See RJR Nabisco, Inc. v. European Community , 579 U.S. ----, ----, 136 S.Ct. 2090, 2100, 195 L.Ed.2d 476 (2016) ("Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application"). We presume that statutes do not apply extraterritorially to "ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." Kiobel v. Royal Dutch Petroleum Co. , 569 U.S. 108, 116, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013) ; see also EEOC v. Arabian American Oil Co. , 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991).
If this danger provides a reason for caution when Congress has enacted a statute but has not provided expressly whether it applies abroad, we have even greater reason for hesitation in deciding whether to extend a judge-made cause of action beyond our borders. "[T]he danger of unwarranted judicial interference in the conduct of foreign policy is magnified" where "the question is not what Congress has *748 done but instead what courts may do." Kiobel , 569 U.S. at 116, 133 S.Ct. 1659. Where Congress has not spoken at all, the likelihood of impinging on its foreign affairs authority is especially acute.
Congress's treatment of ordinary tort claims against federal officers is also revealing. As petitioners and their amici stress, the traditional way in which civil litigation addressed abusive conduct by federal officers was by subjecting them to liability for common-law torts. See Brief for Petitioners 10-17. For many years, such claims could be raised in state or federal court,[8] and this Court occasionally considered tort suits against federal officers for extraterritorial injuries. See, e.g. , Mitchell v. Harmony , 13 How. 115, 14 L.Ed. 75 (1852) (affirming award in trespass suit brought by U.S. citizen against U.S. Army officer who seized personal property in Mexico during the Mexican-American war). After Erie , federal common-law claims were out, but we recognized the continuing viability of state-law tort suits against federal officials as recently as Westfall v. Erwin , 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988).
In response to that decision, Congress passed the so-called Westfall Act, formally the Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679. That Act makes the Federal Tort Claims Act (FTCA) "the exclusive remedy for most claims against Government employees arising out of their official conduct." Hui v. Castaneda , 559 U.S. 799, 806, 130 S.Ct. 1845, 176 L.Ed.2d 703 (2010).[9] Thus, a person injured by a federal employee may seek recovery directly from the United States under the FTCA, but the FTCA bars "[a]ny claim arising in a foreign country." § 2680(k).[10] The upshot is that claims that would otherwise permit the recovery of damages are barred if the injury occurred abroad.
Yet another example is provided by the Torture Victim Protection Act of 1991, note following 28 U.S.C. § 1350, which created a cause of action that may be brought by an alien in a U.S. court under the Alien Tort Statute, § 1350. Under the Torture Victim Protection Act, a damages action may be brought by or on behalf of a victim of torture or an extrajudicial killing carried out by a person who acted under the authority of a foreign *749 state. Consequently, this provision, which is often employed to seek redress for acts committed abroad,[11] cannot be used to sue a United States officer. See Meshal v. Higgenbotham , 804 F.3d 417, 430 (C.A.D.C. 2015) (KAVANAUGH, J., concurring).
These statutes form a pattern that is important for present purposes. When Congress has enacted statutes creating a damages remedy for persons injured by United States Government officers, it has taken care to preclude claims for injuries that occurred abroad.
Instead, when Congress has provided compensation for injuries suffered by aliens outside the United States, it has done so by empowering Executive Branch officials to make payments under circumstances found to be appropriate. Thus, the Foreign Claims Act, 10 U.S.C. § 2734, first enacted during World War II, ch. 645, 55 Stat. 880, allows the Secretary of Defense to appoint claims commissions to settle and pay claims for personal injury and property damage resulting from the noncombat activities of the Armed Forces outside this country. § 2734(a). Similarly, § 2734a allows the Secretary of Defense and the Secretary of Homeland Security to make payments pursuant to "an international agreement which provides for the settlement or adjudication and cost sharing of claims against the United States" that arise out of "acts or omissions" of the Armed Forces. § 2734a(a); see also 22 U.S.C. § 2669(b) (State Department may settle and pay certain claims for death, injury, or property loss or damage "for the purpose of promoting and maintaining friendly relations with foreign countries"); § 2669-1 (Secretary of State has authority to pay tort claims arising in foreign countries in connection with State Department operations); 21 U.S.C. § 904 (Attorney General has authority to pay tort claims arising in connection with the operations of the Drug Enforcement Administration abroad).
This pattern of congressional action-refraining from authorizing damages actions for injury inflicted abroad by Government officers, while providing alternative avenues for compensation in some situations-gives us further reason to hesitate about extending Bivens in this case.
E
In sum, this case features multiple factors that counsel hesitation about extending Bivens , but they can all be condensed to one concern-respect for the separation of powers. See Abbasi , 582 U.S., at ----, 137 S.Ct., at 1857-1858. "Foreign policy and national security decisions are 'delicate, complex, and involve large elements of prophecy' for which 'the Judiciary has neither aptitude, facilities[,] nor responsibility.' " Jesner , 584 U.S., at ----, 138 S.Ct., at 1414 (GORSUCH, J., concurring part and concurring in judgment) (quoting Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp. , 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948) ). To avoid upsetting the delicate web of international relations, we typically presume that even congressionally crafted causes of action do not apply outside our borders. These concerns are only heightened when judges are asked to fashion constitutional remedies. Congress, which has authority in the field of foreign affairs, has chosen not to create liability in similar statutes, leaving the resolution of extraterritorial *750 claims brought by foreign nationals to executive officials and the diplomatic process.
Congress's decision not to provide a judicial remedy does not compel us to step into its shoes. "The absence of statutory relief for a constitutional violation ... does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." Schweiker , 487 U.S. at 421-422, 108 S.Ct. 2460 ; see also Stanley , 483 U.S. at 683, 107 S.Ct. 3054 ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [plaintiff] an 'adequate' federal remedy for his injuries").[12]
When evaluating whether to extend Bivens, the most important question "is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" Abbasi , 582 U.S., at ----, 137 S.Ct., at 1857 (quoting Bush , 462 U.S. at 380, 103 S.Ct. 2404 ). The correct "answer most often will be Congress." 582 U.S., at ----, 137 S.Ct., at 1857. That is undoubtedly the answer here.
* * *
The judgment of the United States Court of Appeals for the Fifth Circuit is affirmed.
It is so ordered.
Justice THOMAS, with whom Justice GORSUCH joins, concurring.
The Court correctly applies our precedents to conclude that the implied cause of action created in Bivens v. Six Unknown Fed. Narcotics Agents , 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), should not be extended to cross-border shootings. I therefore join its opinion.
I write separately because, in my view, the time has come to consider discarding the Bivens doctrine altogether. The foundation for Bivens -the practice of creating implied causes of action in the statutory context-has already been abandoned. And the Court has consistently refused to extend the Bivens doctrine for nearly 40 years, even going so far as to suggest that Bivens and its progeny were wrongly decided. Stare decisis provides no "veneer of respectability to our continued application of [these] demonstrably incorrect precedents." Gamble v. United States , 587 U.S. ----, ----, 139 S.Ct. 1960, 1981, 204 L.Ed.2d 322 (2019) (THOMAS, J., concurring). To ensure that we are not "perpetuat[ing] a usurpation of the legislative power," id. , at ----, 139 S.Ct., at 1984, we should reevaluate our continued recognition of even a limited form of the Bivens doctrine.
" ' Bivens is a relic of the heady days in which this Court assumed common-law powers to create causes of action.' " Wilkie v. Robbins , 551 U.S. 537, 568, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) (THOMAS, J., concurring) (quoting Correctional Services Corp. v. Malesko , 534 U.S. 61, 75, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (Scalia, J., concurring)). In the decade preceding Bivens , the Court believed that it had a duty "to be alert to provide such remedies as are necessary to make effective" Congress' purposes in enacting a statute. J. I. Case Co. v. Borak , 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Accordingly, the Court freely created implied private causes of action for damages under federal statutes. See, e.g., *751 Sullivan v. Little Hunting Park, Inc. , 396 U.S. 229, 239, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) ; Allen v. State Bd. of Elections , 393 U.S. 544, 557, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).
This misguided approach to implied causes of action in the statutory context formed the backdrop of the Court's decision in Bivens . There, the Court held that federal officers who conducted a warrantless search and arrest in violation of the Fourth Amendment could be sued for damages. Bivens , 403 U.S. at 397, 91 S.Ct. 1999. The Court acknowledged that Congress had not provided a statutory cause of action for damages against federal officers and that "the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages." Id. , at 396-397, 91 S.Ct. 1999. But it concluded, consistent with the then-prevailing understanding of implied causes of action in the statutory context, that federal courts could infer such a "remedial mechanism." Id. , at 397, 91 S.Ct. 1999 (citing Borak , 377 U.S. at 433, 84 S.Ct. 1555 ).
This holding "broke new ground." Ante , at 741. From the ratification of the Bill of Rights until 1971, the Court did not create "implied private action[s] for damages against federal officers alleged to have violated a citizen's constitutional rights." Malesko , 534 U.S. at 66, 122 S.Ct. 515. Suits to recover such damages were generally brought under state tort law. See Wheeldin v. Wheeler , 373 U.S. 647, 652, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963). Bivens thus opened the door to a new avenue for recovering damages from federal officers. In the wake of that decision, the Court recognized an implied cause of action for damages against a Member of Congress accused of sex discrimination in violation of the Fifth Amendment's Due Process Clause, Davis v. Passman , 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and against prison officials accused of denying medical care in violation of the Eighth Amendment's Cruel and Unusual Punishments Clause, Carlson v. Green , 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Given this Court's trend of creating implied causes of action, "there was a possibility that the Court would keep expanding Bivens until it became the substantial equivalent of 42 U.S.C. § 1983." Ziglar v. Abbasi , 582 U.S. ----, ----, 137 S.Ct. 1843, 1855, 198 L.Ed.2d 290 (2017) (internal quotation marks omitted).
The Court, however, eventually corrected course. In the statutory context, the Court "retreated from [its] previous willingness to imply a cause of action where Congress has not provided one." Malesko , 534 U.S. at 67, n. 3, 122 S.Ct. 515. After a series of decisions limiting courts' discretion to create statutory causes of action, we renounced the Court's freewheeling approach in Alexander v. Sandoval , 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), explicitly repudiating the precedent used to support Bivens , 532 U.S. at 287, 121 S.Ct. 1511 (abrogating Borak , 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 ). We explained that, "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress." 532 U.S. at 286, 121 S.Ct. 1511. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." Ibid. Without such intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." Id. , at 286-287, 121 S.Ct. 1511.
The Court's method of implying causes of action for damages in the statutory context provided the foundation for the approach taken in Bivens . Therefore, as the Court backed away from creating statutory causes of action, it also effectively cabined *752 the Bivens doctrine to the facts of Bivens , Davis , and Carlson . For nearly 40 years, the Court has " 'consistently refused to extend Bivens liability to any new context or new category of defendants.' " Abbasi , 582 U.S., at ----, 137 S.Ct., at 1857 (quoting Malesko , 534 U.S. at 68, 122 S.Ct. 515 ); see also ante , at 750.*
In doing so, our decisions have undermined the validity of the Bivens doctrine. As the Court recognizes, "[w]e have stated that expansion of Bivens is a disfavored judicial activity." Ante , at 742 (internal quotation marks omitted). And we have now repeatedly acknowledged the shaky foundation on which Bivens rests, stating that "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three Bivens cases might have been different if they were decided today." Abbasi , 582 U.S., at ----, 137 S.Ct., at 1856 ; see also ante , at 743 (noting that it is "doubtful that we would have reached the same result" if Bivens were decided today). Thus, it appears that we have already repudiated the foundation of the Bivens doctrine; nothing is left to do but overrule it.
Our continued adherence to even a limited form of the Bivens doctrine appears to "perpetuat[e] a usurpation of the legislative power." Gamble , 587 U.S., at ----, 139 S.Ct., at 1984 (THOMAS, J., concurring). Federal courts lack the authority to engage in the distinctly legislative task of creating causes of action for damages to enforce federal positive law. We have clearly recognized as much in the statutory context. See supra , at 751. I see no reason for us to take a different approach if the right asserted to recover damages derives from the Constitution, rather than from a federal statute. Either way, we are exercising legislative power vested in Congress. Cf. Carlson , 446 U.S. at 51, 100 S.Ct. 1468 (Rehnquist, J., dissenting) ("The policy questions at issue in the creation of any tort remedies, constitutional or otherwise, involve judgments as to diverse factors that are more appropriately made by the legislature than by this Court in an attempt to fashion a constitutional common law").
This usurpation of legislative power is all the more troubling because Congress has demonstrated that it knows how to create a cause of action to recover damages for constitutional violations when it wishes to do so. In 42 U.S.C. § 1983, Congress provided a cause of action that allows persons to recover damages for certain deprivations of constitutional rights by state officers . Congress has chosen not to provide such a cause of action against federal officers . In fact, it has pre-empted the state tort suits that traditionally served as the mechanism by which damages were recovered from federal officers. 28 U.S.C. § 2679(b) ; Minneci v. Pollard , 565 U.S. 118, 126, 132 S.Ct. 617, 181 L.Ed.2d 606 (2012). "[I]t is not for us to fill any hiatus Congress has left in this area." Wheeldin , 373 U.S. at 652, 83 S.Ct. 1441.
* * *
The analysis underlying Bivens cannot be defended. We have cabined the doctrine's *753 scope, undermined its foundation, and limited its precedential value. It is time to correct this Court's error and abandon the doctrine altogether.
Justice GINSBURG, with whom Justice BREYER, Justice SOTOMAYOR, and Justice KAGAN join, dissenting.
In Bivens v. Six Unknown Fed. Narcotics Agents , 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), this Court held that injured plaintiffs could pursue claims for damages against U.S. officers for conduct disregarding constitutional constraints. The instant suit, invoking Bivens , arose in tragic circumstances. In 2010, the complaint alleges, a Mexican teenager was playing with friends in a culvert along the United States-Mexico border. A U.S. Border Patrol agent, in violation of instructions controlling his office and situated on the U.S. side of the border, shot and killed the youth on the Mexican side. The boy's parents sued the officer for damages in federal court, alleging that a rogue federal law enforcement officer's unreasonable use of excessive force violated the Fourth and Fifth Amendments. At the time of the incident, it is uncontested, the officer did not know whether the boy he shot was a U.S. national or a citizen of another land. See Hernández v. Mesa , 582 U.S. ----, ---- - ----, 137 S.Ct. 2003, 2006-2008, 198 L.Ed.2d 625 (2017) (per curiam )
When the case first reached this Court, the Court remanded it, instructing the Court of Appeals to resolve a threshold question: Is a Bivens remedy available to noncitizens (here, the victim's parents) when the U.S. officer acted stateside, but the impact of his alleged wrongdoing was suffered abroad? To that question, the sole issue now before this Court, I would answer "yes." Rogue U.S. officer conduct falls within a familiar, not a "new," Bivens setting. Even if the setting could be characterized as "new," plaintiffs lack recourse to alternative remedies, and no "special factors" counsel against a Bivens remedy. Neither U.S. foreign policy nor national security is in fact endangered by the litigation. Moreover, concerns attending the application of our law to conduct occurring abroad are not involved, for plaintiffs seek the application of U.S. law to conduct occurring inside our borders. I would therefore hold that the plaintiffs' complaint crosses the Bivens threshold.
I
Because this case was resolved on a motion to dismiss, I accept the complaint's allegations, next set out, as true. In 2010, Sergio Adrián Hernández Güereca, a 15-year-old citizen of Mexico, was playing with his friends in the dry culvert that divides El Paso, Texas, from Ciudad Juarez, Mexico. The international boundary line runs down the center of the culvert, but the only visible border-related features are fences and border-crossing posts that sit atop each side. See Hernández , 582 U.S., at ----, 137 S.Ct., at 2008-2009 (BREYER, J., dissenting). The game Hernández and his friends were playing involved running up the embankment on the United States side, touching the barbed-wire fence, and running back down to the Mexican side. While the game was ongoing, Border Patrol Agent Jesus Mesa, Jr., appeared on his bicycle and detained one of Hernández's friends as he was running down the embankment on the U.S. side. Hernández, who was unarmed, retreated into Mexican territory. Mesa pointed his weapon across the border, "seemingly taking careful aim," and fired at least two shots. App. to Pet. for Cert. 199. At least one of the shots struck Hernández in the face, killing him.
Hernández's parents brought suit under Bivens , asserting, inter alia , that Mesa *754 had violated their son's Fourth and Fifth Amendment rights. The United States District Court for the Western District of Texas granted Mesa's motion to dismiss. A panel of the United States Court of Appeals for the Fifth Circuit affirmed the dismissal of the parents' Fourth Amendment claim but held that their Fifth Amendment claim could proceed.
The Court of Appeals reheard the case en banc and affirmed the District Court's dismissal of the parents' claims. The full court agreed with the panel that Hernández lacked Fourth Amendment rights. Hernandez v. United States , 785 F.3d 117, 119 (5th Cir. 2015) (per curiam ) (citing United States v. Verdugo-Urquidez , 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) ).[1] It declined, however, to resolve whether Mesa's conduct violated the Fifth Amendment, concluding that, in any event, Mesa was entitled to qualified immunity. 785 F.3d at 120-121.
This Court vacated the Court of Appeals' judgment and remanded with several instructions. First, the Court directed the Court of Appeals to address the "antecedent" question whether the suit could be premised on Bivens in light of the Court's recent decision in Ziglar v. Abbasi , 582 U.S. ----, ----, 137 S.Ct. 1843, 1851, 198 L.Ed.2d 290 (2017). Hernández , 582 U.S., at ---- - ----, 137 S.Ct., at 2006-2007. The Court also identified error in the Court of Appeals' qualified-immunity analysis. Id. , at ---- - ----, 137 S.Ct., at 2006-2008. That analysis had centered on Hernández's status as an alien with no significant connections to the United States, but it is "undisputed ... that Hernández's nationality and the extent of his ties to the United States were unknown to Mesa at the time of the shooting." Id. , at ----, 137 S.Ct., at 2007. The Court declined to address whether Hernández had stated a valid Fourth Amendment claim. Id. , at ----, 137 S.Ct., at 2006-2007. But see id. , at ---- - ----, 137 S.Ct., at 2008-2012 (BREYER, J., dissenting).
On remand, the Court of Appeals, again sitting en banc, affirmed the District Court's dismissal of the suit. The action presented a "new context" for Bivens , the court concluded, and special factors counseled its hesitation. 885 F.3d 811, 816-823 (C.A.5 2018). Dissenting, Judge Prado (joined by Judge Graves) urged that the majority had been "led astray from the familiar circumstances of this case by empty labels of national security, foreign affairs, and extraterritoriality." Id. , at 825.
II
The plaintiff in Bivens alleged that, during an unjustified search of his home, rogue federal law enforcement officers unlawfully seized him, employing "unreasonable force ... in making the arrest." 403 U.S. at 389, 91 S.Ct. 1999. This Court afforded him a federal damages remedy against the federal agents who had disregarded the Fourth Amendment's prohibitions against unreasonable searches and *755 seizures. Id. , at 390-397, 91 S.Ct. 1999. The Court did so directly under the Constitution, for Congress had provided no statutory claim for relief to redress the wrongful conduct. See ibid . "Historically," the Court observed, "damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." Id. , at 395-396, 91 S.Ct. 1999. Given the circumstances presented in Bivens , the Court found "no special factors counselling hesitation [despite] the absence of affirmative action by Congress." Id. , at 396, 91 S.Ct. 1999. Justice Harlan concurred in the judgment, emphasizing that damages were "the only possible remedy for someone in [the plaintiff 's] alleged position." Id. , at 409-410, 91 S.Ct. 1999 (injunctions could not "obviate the harm" done, the United States was "immune to suit," and the exclusionary rule was "irrelevant" for those "innocen[t] of the crime charged").
The Court has extended Bivens twice. See Davis v. Passman , 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (sex-discrimination claim against a congressman under the Fifth Amendment's Due Process Clause); Carlson v. Green , 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (inadequate medical treatment claim against federal prison officials under the Eighth Amendment). Though the Court has more recently declined to extend Bivens to new contexts, see Abbasi , 582 U.S., at ---- - ----, 137 S.Ct., at 1856-1858, Bivens remains the law of the land in settings in which the decision has been held to apply, see Abbasi , 582 U.S., at ----, 137 S.Ct., at 1856-1857.
In Abbasi , former immigration detainees alleged mistreatment and discrimination following the September 11, 2001 terrorist attacks. Id. , at ---- - ----, 137 S.Ct., at 1852-1853. Invoking Bivens , the plaintiffs sued the former Attorney General, Federal Bureau of Investigation Director, and Immigration and Naturalization Service Commissioner, as well as detention-facility wardens, under the Fourth and Fifth Amendments. 582 U.S., at ----, 137 S.Ct., at 1853. Though recognizing that one of the plaintiffs' Bivens claims might be viable, 582 U.S., at ---- - ----, 137 S.Ct., at 1863-1865,[2] the Court held that the other claims could not proceed under Bivens . A lawsuit challenging "a high-level executive policy" framed in response to "a major terrorist attack," the Court observed, bore "little resemblance to" previous Bivens settings. 582 U.S., at ---- - ----, 137 S.Ct., at 1859-1860. As considerations counseling hesitation to extend Bivens to the setting in Abbasi , the Court stressed the impropriety of using Bivens to challenge governmental policies, the risk of judicial disruption of national security decision-making, and the availability of alternative remedies. 582 U.S., at ---- - ----, 137 S.Ct., at 1860-1864.
Concerning future invocations of Bivens , Abbasi provided several guides. On whether a case presents a new Bivens context, the Court stated: "If the case is different in a meaningful way from previous Bivens cases decided by this Court, then the context is new." 582 U.S., at ----, 137 S.Ct., at 1859. And on whether to extend Bivens to a new context, Abbasi identified as the critical inquiry: Is "the Judiciary ... well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action *756 to proceed"? 582 U.S., at ----, 137 S.Ct., at 1858.
While reining in this Court's Bivens jurisprudence, the Court cautioned in Abbasi that its "opinion is not intended to cast doubt on the continued force, or even the necessity, of Bivens in the search-and-seizure context in which it arose." 582 U.S., at ----, 137 S.Ct., at 1856. "The settled law of Bivens in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere." Ibid. The Court also reiterated that suits against "the individual official for his or her own acts" deter behavior incompatible with constitutional norms, a consideration key to the Bivens decision. 582 U.S., at ----, 137 S.Ct., at 1860 (emphasis added). "[I]ndividual instances of ... law enforcement overreach," the Court recognized, are by "their very nature ... difficult to address except by way of damages actions after the fact." Id. , at ----, 137 S.Ct., at 1862 (emphasis added).
III
Plaintiffs' Bivens action arises in a setting kin to Bivens itself: Mesa, plaintiffs allege, acted in disregard of instructions governing his conduct and of Hernández's constitutional rights. Abbasi acknowledged the "fixed principle" that plaintiffs may bring Bivens suits against federal law enforcement officers for "seizure[s]" that violate the Fourth Amendment. 582 U.S., at ----, 137 S.Ct., at 1877 ; supra , at 755.[3] Using lethal force against a person who "poses no immediate threat to the officer and no threat to others" surely qualifies as an unreasonable seizure. Tennessee v. Garner , 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The complaint states that Mesa engaged in that very conduct; it alleged, specifically, that Hernández was unarmed and posed no threat to Mesa or others. For these reasons, as Mesa acknowledged at oral argument, Hernández's parents could have maintained a Bivens action had the bullet hit Hernández while he was running up or down the United States side of the embankment. See Tr. of Oral Arg. 50.
The only salient difference here: the fortuity that the bullet happened to strike Hernández on the Mexican side of the embankment. But Hernández's location at the precise moment the bullet landed should not matter one whit. After all, "[t]he purpose of Bivens is to deter the officer ." Abbasi , 582 U.S., at ----, 137 S.Ct., at 1860 (internal quotation marks omitted); supra, at 755. And primary conduct constrained by the Fourth Amendment is an officer 's unjustified resort to excessive force. See Garner , 471 U.S. at 20-22, 105 S.Ct. 1694. Mesa's allegedly unwarranted deployment of deadly force occurred on United States soil. It scarcely makes sense for a remedy trained on deterring rogue officer conduct to turn upon a happenstance subsequent to the conduct-a bullet landing in one half of a culvert, not the other.
*757 Nor would it make sense to deem some culvert locations "new settings" for Bivens purposes, but others (those inside the United States), familiar territory. As recounted in Justice BREYER's dissent earlier in this litigation, the culvert "does not itself contain any physical features of a border"; it consists of wide swaths of "concrete-lined empty space" with fencing on each side. Hernández , 582 U.S., at ----, 137 S.Ct., at 2009. See also id., at ----, 137 S.Ct., at 2006-2007 (noting "the near irrelevance of [the] midculvert line ... for most border-related purposes"). It is not asserted that Mesa "knew on which side of the boundary line [his] bullet would land." Id. , at ----, 137 S.Ct., at 2010.
Finally, although the bullet happened to land on the Mexican side of the culvert, the United States, as in Bivens , unquestionably has jurisdiction to prescribe law governing a Border Patrol agent's conduct. That prescriptive jurisdiction reaches "conduct that ... takes place within [United States] territory." Restatement (Third) of Foreign Relations Law of the United States § 402 (1986). The place of a rogue officer's conduct "has peculiar significance" to choice of the applicable law where, as here, "the primary purpose of the tort rule involved is to deter or punish misconduct." Restatement (Second) of Conflict of Laws § 145, Comment e , p. 420 (1969).[4]
IV
Even accepting, arguendo , that the setting in this case could be characterized as "new," there is still no good reason why Hernández's parents should face a closed courtroom door. As in Bivens , plaintiffs lack recourse to alternative remedies. And not one of the "special factors" the Court identifies weigh any differently based on where a bullet happens to land.
A
It was "of central importance" to the Court's disposition in Abbasi that the case was "[un]like Bivens ... in which 'it [was] damages or nothing.' " 582 U.S., at ----, 137 S.Ct., at 1862 (quoting Bivens , 403 U.S. at 410, 91 S.Ct. 1999 (Harlan, J., concurring in judgment)). Here, as Judge Prado, dissenting below, observed, "[i]t is uncontested that plaintiffs find no alternative relief in Mexican law, state law, the Federal Tort Claims Act ('FTCA'), the Alien Tort Statute ('ATS'), or federal criminal law." 885 F.3d at 827. While the absence of alternative remedies, standing alone, does not warrant a Bivens action, cf. ante , at 749, it remains a significant consideration under Abbasi 's guidelines.
B
The special factors featured by the Court relate, in the main, to foreign policy and national security. But, as suggested earlier, see supra , at 756, no policies or policymakers are challenged in this case. Plaintiffs target the rogue actions of a rank-and-file law enforcement officer acting in violation of rules controlling his office. See 8 CFR § 287.8(a)(2)(ii) (2019) (limiting use of deadly force). The situation here presented resembles cases Abbasi distinguished-cases involving "individual instances of ... law enforcement overreach."
*758 582 U.S., at ----, 137 S.Ct., at 1862.
The Court nevertheless asserts that the instant suit has a "potential effect on foreign relations" because it invites courts "to arbitrate between" the United States and Mexico. Ante, at 744, 745. Plaintiffs, however, have brought a civil damages action, no different from one a federal court would entertain had the fatal shot hit Hernández before he reached the Mexican side of the border. True, cross-border shootings spark bilateral discussion, but so too does a range of smuggling and other border-related issues that courts routinely address "concurrently with whatever diplomacy may also be addressing them." Rodriguez v. Swartz , 899 F.3d 719, 747 (C.A.9 2018). The Government has identified no deleterious effect on diplomatic negotiations in any case after the Ninth Circuit held that the mother of a boy killed in a cross-border shooting could institute a Bivens action. See 899 F.3d at 734.
Moreover, the Court, in this case, cannot escape a "potential effect on foreign relations," ante, at 744, by declining to recognize a Bivens action. As the Mexican Government alerted the Court: "[R]efus[al] to consider [Hernández's] parents' claim on the merits ... is what has the potential to negatively affect international relations." Brief for Government of the United Mexican States as Amicus Curiae 12.
Notably, recognizing a Bivens suit here honors our Nation's international commitments. Article 9(5) of the International Covenant on Civil and Political Rights (ICCPR), Dec. 19, 1966, S. Treaty Doc. No. 95-20, 999 U. N. T. S. 176, provides that "[a]nyone who has been the victim of unlawful arrest or detention shall have an enforceable right to compensation." The United States ratified the ICCPR with the "understandin[g]" that Article 9(5) "require[s] the provision of effective and enforceable mechanisms by which a victim of an unlawful arrest or detention or a miscarriage of justice may seek and, where justified, obtain compensation from either the responsible individual or the appropriate governmental entity." U.S. Reservations, Declarations, and Understandings, ICCPR, 138 Cong. Rec. 8071 (1992). See also 1676 U. N. T. S. 544 (entered into force Sept. 8, 1992). One fitting mechanism to obtain compensation is a Bivens action. See Senate Committee on Foreign Relations, ICCPR, S. Exec. Rep. No. 102-23, p. 15 (1992).
The Court also asserts, as cause for hesitation, "the risk of undermining border security." Ante , at 747. But the Court speaks with generality of the national-security involvement of Border Patrol officers. It does not home in on how a Bivens suit for an unjustified killing would in fact undermine security at the border. Abbasi cautioned against invocations of national security of this very order: "[N]ational-security concerns must not become a talisman used to ward off inconvenient claims-a 'label' used to 'cover a multitude of sins.' " 582 U.S., at ----, 137 S.Ct., at 1862 (quoting Mitchell v. Forsyth , 472 U.S. 511, 523, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ). Instructions regulating Border Patrol agents tell them to guard against deploying unjustified deadly force. See 8 CFR § 287.8(a)(2)(ii). Given that instruction, I do not grasp how allowing a Bivens action here would intrude upon the political branches' national-security prerogatives.
Congress, although well aware of the Court's opinion in Bivens , see, e.g. , S. Exec. Rep. No. 102-23, at 15, has not endeavored to dislodge the decision. The Court cites several statutes in support of the argument that affording a Bivens action to Hernández's parents would be inconsistent with measures Congress has *759 taken. None of the cited statutes should stand in plaintiffs' way.
Section 1983 actions, the Court points out, are available only to "person[s] within the jurisdiction" of the United States. 42 U.S.C. § 1983.[5] That statute has, as its provenance, Reconstruction-era policies aiming to secure to former slaves federal rights and to ward off state and local incursion on those rights. See Mitchum v. Foster , 407 U.S. 225, 238-239, and n. 30, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). "It is inconceivable that ... Congress [then] thought about (and deliberately excluded liability for) cross-border incidents involving federal officials." Rodriguez , 899 F.3d at 742.
The FTCA is also inapposite. Its exclusion of "claim[s] arising in a foreign country," 28 U.S.C. § 2680(k), reflects "Congress's 'unwilling[ness] to subject the United States to liabilities depending upon the laws of a foreign power.' " Sosa v. Alvarez-Machain , 542 U.S. 692, 707, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (quoting United States v. Spelar , 338 U.S. 217, 221, 70 S.Ct. 10, 94 L.Ed. 3 (1949) ). Here, however, the suit arises under U.S. law. Even as the Westfall Act amended the FTCA to make it the "exclusive" remedy for scope-of-employment claims against Government officers, § 2679(b)(1), Congress carved out an exception for Bivens suits, § 2679(b)(2)(A) (excepting civil claims "brought for a violation of the Constitution of the United States"). The Torture Victim Protection Act of 1991 applies exclusively to wrongdoers acting under color of foreign law. 28 U.S.C. § 1350 Note. The conduct of federal and state officers is outside that Act's purview.[6]
Nor are concerns sometimes attending application of our law abroad implicated in this case. True, the Court has applied a "presumption against extraterritorial application" to statutes that do not make plain their governance beyond U.S. borders. Kiobel v. Royal Dutch Petroleum Co. , 569 U.S. 108, 115, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013). But plaintiffs in this case allege a tort stemming from stateside conduct. Cf. id. , at 124-125, 133 S.Ct. 1659 (if conduct at issue "touch[es] and concern[s] the territory of the United States ... with sufficient force," the presumption against extraterritoriality is displaced). This case scarcely resembles those in which applying "U.S. law ... to conduct in foreign countries" might spark "international discord." RJR Nabisco, Inc. v. European Community , 579 U.S. ----, ----, 136 S.Ct. 2090, 2100, 195 L.Ed.2d 476 (2016). Quite the opposite. Withholding a Bivens suit here threatens to exacerbate bilateral relations, see supra, at 758, and in no way fosters our international commitments, see supra , at 758 - 759.
V
Regrettably, the death of Hernández is not an isolated incident. Cf.
*760 Rodriguez , 899 F.3d at 727 (complaint alleged that border agent fired 14 to 30 bullets across the border, killing a 16-year-old boy); Brief for Immigrant and Civil Rights Organizations as Amici Curiae 26-28 (describing various incidents of allegedly unconstitutional conduct by border and immigration officers); Brief for Border Network for Human Rights et al. as Amici Curiae 8-15 (listing individuals killed by border agents). One report reviewed over 800 complaints of alleged physical, verbal, or sexual abuse lodged against Border Patrol agents between 2009 and 2012; in 97% of the complaints resulting in formal decisions, no action was taken. D. Martínez, G. Cantor, & W. Ewing, No Action Taken: Lack of CBP Accountability in Responding to Complaints of Abuse, American Immigration Council 1-8 (2014), americanimmigrationcouncil.org/sites/default/files/research/No%20Action%20Taken_Final.pdf. According to amici former Customs and Border Protection officials, "the United States has not extradited a Border Patrol agent to stand trial in Mexico, and to [amici 's] knowledge has itself prosecuted only one agent in a cross-border shooting." Brief for Former Officials of U.S. Customs and Border Protection Agency as Amici Curiae 4. These amici warn that, "[w]ithout the possibility of civil liability, the unlikely prospect of discipline or criminal prosecution will not provide a meaningful deterrent to abuse at the border." Ibid . In short, it is all too apparent that to redress injuries like the one suffered here, it is Bivens or nothing.
* * *
I resist the conclusion that "nothing" is the answer required in this case. I would reverse the Fifth Circuit's judgment and hold that plaintiffs can sue Mesa in federal court for violating their son's Fourth and Fifth Amendment rights.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co. , 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

See App. to Pet. for Cert. 198-199; Dept. of Justice, Federal Officials Close Investigation Into the Death of Sergio Hernandez-Guereca (Apr. 27, 2012), https://www.justice.gov/opa/pr/federal-officials-closeinvestigation-death-sergio-hernandez-guereca (hereinafter DOJ Press Release).

See Dept. of Homeland Security, Written Testimony for House Comm. on Oversight and Govt. Reform Hearing (Sept. 9, 2015), https://www.dhs.gov/news/2015/09/09/written-testimony-dhs-southern-border-and-approaches-campaign-joint-task-force-west (discussing creation of Border Violence Prevention Council); Dept. of Homeland Security, Border Violence Prevention Council Fact Sheet, https://www.dhs.gov/sites/default/files/publications/bvpc-fact-sheet.pdf (outlining areas of collaboration); Dept. of State, Joint Statement on the U.S.-Mexico Bilateral High Level Dialogue on Human Rights (Oct. 27, 2016), https://2009-2017.state.gov/r/pa/prs/ps/2016/10/263759.htm (noting discussion of "the use of force at the border").

It is no answer to argue, as Mexico does, that refusing to extend Bivens "is what [would] negatively affect international relations." Brief for Government of United Mexican States as Amicus Curiae 12. When a third party intervenes and takes sides in a dispute between two countries, one country is likely to be pleased and the other displeased. But no matter which side the third party supports, it will have injected itself into their relations.

See Dept. of Transp., Bureau of Transp. Statistics, Border Crossing/ Entry Data, https://explore.dot.gov/views/BorderCrossingData/Monthly (detailing the millions of individuals and vehicles that cross the U.S.-Mexico border each month); U.S. Int'l Trade Comm'n, The Year in Trade 2018, p. 190 (USITC Pub. No. 4986, 2019 ) (explaining that in 2018 the United States imported $346.5 billion of goods from Mexico).

Dept. of Homeland Security, U.S. Customs and Border Protection, Southwest Border Migration FY 2019, https://cbp.gov/newsroom/stats/sw-border-migration/fy-2019.

Dept. of Homeland Security, U.S. Customs and Border Protection, CBP Enforcement Statistics FY2019, https://cbp.gov/newsroom/stats/cbp-enforcement-statistics-fy2019 (explaining that in FY2019, Border Patrol officers seized 11,682 pounds of cocaine, 266,882 pounds of marijuana, and 14,434 pounds of methamphetamine).

Cong. Research Serv., Mexico: Organized Crime and Drug Trafficking Organizations, Summary (2019) ("Mexican drug trafficking organizations ... pose the greatest crime threat to the United States"); Dept. of Justice, Drug Enforcement Admin., 2018 National Drug Threat Assessment 97 (DEA-DCT-DIR-032-18) (explaining that "Mexican [transnational criminal organizations] ... maintain the greatest drug trafficking influence in the United States").

State-law claims could be asserted in federal court if the parties' citizenship was diverse, and federal common-law claims could be raised until Erie R. Co. v. Tompkins , 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The Act also permits claims "brought for a violation of the Constitution." 28 U.S.C. § 2679(b)(2)(A). By enacting this provision, Congress made clear that it was not attempting to abrogate Bivens , but the provision certainly does not suggest, as one of petitioners' amici contends, that Congress "intended for a robust enforcement of Bivens remedies." Brief for Institute for Justice as Amicus Curiae 21. Instead, the provision simply left Bivens where it found it. It is not a license to create a new Bivens remedy in a context we have never before addressed, see Correctional Services Corp. v. Malesko , 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001).

Petitioners contend that Congress excluded claims arising abroad in order to avoid subjecting the United States to liability under foreign law, something that cannot occur under Bivens . Reply Brief 11. But neither the legislative history recounted in Sosa v. Alvarez-Machain , 542 U.S. 692, 707, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), nor anything else offered by petitioners shows that this was the only reason for this limitation. And the fact remains that the FTCA does not permit claims for torts committed abroad, a limitation that is consistent with Congress's general practice of avoiding extraterritorial legislation. See, e.g., Kiobel v. Royal Dutch Petroleum Co. , 569 U.S. 108, 115-116, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013).

See, e.g. , Samantar v. Yousuf , 560 U.S. 305, 308, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010) (bringing claim under the Torture Victim Protection Act against the former First Vice President and Minister of Defense of Somalia for alleged torture and extrajudicial killing in Somalia).

Indeed, in Abbasi we explained that existence of alternative remedies was merely a further reason not to create Bivens liability. See 582 U.S., at ----, 137 S.Ct., at 1863 ("[W]hen alternative methods of relief are available, a Bivens remedy is usually not").

See, e.g. , ante , at 750; Ziglar v. Abbasi , 582 U.S. ----, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017) ; Minneci v. Pollard , 565 U.S. 118, 132 S.Ct. 617, 181 L.Ed.2d 606 (2012) ; Wilkie v. Robbins , 551 U.S. 537, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) ; Correctional Services Corp. v. Malesko , 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) ; FDIC v. Meyer , 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) ; Schweiker v. Chilicky , 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) ; United States v. Stanley , 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) ; Bush v. Lucas , 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) ; Chappell v. Wallace , 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983).

United States v. Verdugo-Urquidez , 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), is not dispositive of the Fourth Amendment claim in this case. There, the Court held that the Fourth Amendment did not apply to federal agents' warrantless search of a Mexican drug trafficker's home in Mexico. Id ., at 262, 274-275, 110 S.Ct. 1056. Verdugo-Urquidez 's practical concerns, among them, that a warrant issued by a U.S. judge "would be a dead letter outside the United States," id. , at 274, 110 S.Ct. 1056, do not bear on the complaint filed by Hernández's parents. In contrast to Verdugo-Urquidez , it would not be "impracticable" or "anomalous" to subject Mesa's U.S.-based conduct to Fourth Amendment scrutiny. Boumediene v. Bush , 553 U.S. 723, 759-760, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (quoting Verdugo-Urquidez , 494 U.S. at 278, 110 S.Ct. 1056 (Kennedy, J., concurring)).

The detainees had alleged, inter alia , that one of the wardens violated the Fifth Amendment by allowing prison guards to abuse them. Ziglar v. Abbasi , 582 U.S. ----, ----, 137 S.Ct. 1843, 1863-1864, 198 L.Ed.2d 290 (2017). The Court remanded this claim for the Court of Appeals to conduct a special-factors analysis in the first instance. Id. , at ----, 137 S.Ct., at 1865.

Unlike Abbasi , this case does not meaningfully differ from Bivens v. Six Unknown Fed. Narcotics Agents , 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), with respect to the "rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; [or] the statutory or other legal mandate under which the officer was operating." Abbasi , 582 U.S., at ----, 137 S.Ct., at 1860. As differences material to a new-context determination, Abbasi also lists: "the risk of disruptive intrusion by the Judiciary into the functioning of other branches ... or the presence of potential special factors that previous Bivens cases did not consider." Ibid. These considerations overlap with the special-factors inquiry to which I turn in Part IV.

The Court of Appeals typed the setting of this case "new" because it was unsure whether the asserted constitutional rights extended "to foreign citizens on foreign soil." 885 F.3d 811, 817 (C.A.5 2018). But that question is appropriately addressed in deciding this case on the merits. The Court of Appeals' uncertainty does not mean a claim arises in a "new" context for Bivens purposes, for "[t]here will always be at least some uncertainty as to whether[, once factual allegations are tested at trial,] a plaintiff is ultimately going to prevail on his constitutional claims." Brief for Petitioners 24.

Title 42 U.S.C. § 1983 reads: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The Torture Victim Protection Act sought to codify a Second Circuit opinion recognizing "a right of action against foreign torturers" under the Alien Tort Claims Act. H. R. Rep. No. 102-367, pp. 3-4 (1991) (discussing Filartiga v. Pena-Irala , 630 F.2d 876 (C.A.2 1980) ). "Domestic officials were not at issue." Rodriguez v. Swartz , 899 F.3d 719, 743 (C.A.9 2018).