# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 20-5255**

**September Term, 2021**

FILED ON: JULY 29, 2022

K.O., BY AND THROUGH THEIR PARENTS AND NEXT FRIENDS, E.O. AND L.J., ET AL.,
APPELLANTS

v.

JEFFERSON B. SESSIONS, III, FORMER ATTORNEY GENERAL OF THE UNITED STATES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-00309)

Before: WILKINS and RAO, *Circuit Judges*, and SILBERMAN\*, *Senior Circuit Judge*.

## J U D G M E N T

This appeal was considered on the record, briefs, and oral arguments of the parties. The Court has accorded the issues full consideration and determined that they do not warrant a published opinion. *See* FED R. APP. P. 36; D.C. CIR. R. 36(d). For the reasons set out below, it is

**ORDERED AND ADJUDGED** that the judgment of the District Court be **AFFIRMED**.

Beginning in 2016 the former Attorney General, Jefferson B. Sessions, introduced the zero-tolerance policy whereby non-United States citizens who entered the United States without prior authorization would be immediately prosecuted under 8 U.S.C § 1325(a). *See Memorandum for Federal Prosecutors Along the Southwest Border*, OFFICE OF THE ATT'Y GEN. (Apr. 6, 2018), https://www.justice.gov/opa/press-release/file/1049751/download; *see also* News Release, U.S. DOJ, Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry (April 6, 2018), 2018 WL 1666622. According to the complaint before us, this practice prompted the separation of hundreds of migrant children from their parents. After parents were placed in

---

\* A separate concurring statement by Senior Circuit Judge Silberman is issued with this judgment and will be published.

criminal detention, their children were determined to be "unaccompanied minor[s]" under 8 U.S.C. § 1232(b)(1), were handed over to the Department of Health and Human Services ("HHS") pursuant to 8 U.S.C. § 1232(b)(3), and were thereby separated from their parents. Following criticism of the practice, then-President Trump signed an Executive Order requiring the preservation of the "family unit" by keeping migrant families together during criminal and immigration proceedings to the extent permitted by law, while also maintaining "rigorous[]" enforcement of immigration laws. *See* Exec. Order No. 13,841, 83 Fed. Reg. 29,435 (June 20, 2018).

In the ensuing years, numerous lawsuits have been filed in response to this family-separation practice, including this case. At the District Court, the Appellants alleged several constitutional violations and sought damages from various Executive Branch officials in their individual capacities; unnamed federal agents employed by Immigration and Customs Enforcement ("ICE"), Customs and Border Protection ("CBP"), the Office of Refugee Resettlement ("ORR"), and HHS; and unnamed persons employed by "entities with which ORR and HHS contracted to provide services." J.A. 8. The Appellants also alleged that these Executive Branch officials engaged in a conspiracy to infringe on their constitutional rights in violation of 42 U.S.C. §§ 1985(3) and 1986. For the reasons discussed in Part II, we affirm the judgment of the District Court dismissing the Appellants' claims.

## I.

### A. Factual Background

Appellants are children who entered the United States with their families and were subsequently detained and separated from their parents. The Appellants are suing on behalf of a putative class of other similarly situated children.

According to the complaint, Executive Branch officials—various high-level officials,[1] and line agents employed by ICE, CBP, ORR, and HHS—engaged in the systematic separation of thousands of migrant children. Beginning in 2017, Appellants allege that Executive Branch officials forcibly "separate[ed] thousands of migrant children from their families while in immigration detention, in an abusive manner and without the parents' or children's consent." J.A. 33. The Appellants described this as a widespread practice of prosecuting or referring for prosecution the parents of the migrant children as a pretext to separate thousands of families. *Id.* They allege that parents who were criminally prosecuted for entering into the country without authorization were, in the vast majority of cases, "transferred to federal criminal custody, pled guilty to the criminal offense, were given a sentence of time served, and transferred back to civil

---

[1] The named Executive Branch officials include the following: former Attorney General Jeff Sessions, former Department of Homeland Security ("DHS") Secretary Kirstjen Nielsen, former White House Chief of Staff John Kelly, former Senior Advisor to then-President Trump Stephen Miller, former Counsel to the Attorney General Gene Hamilton, former Director of ICE Thomas Homan, former Acting Director of ICE and former Acting Deputy Commissioner of CBP Ronald D. Vitiello, former United States Citizenship and Immigration Services ("USCIS") Director L. Francis Cissna, former Acting DHS Secretary and former Commissioner of CBP Kevin McAleenan, former HHS Secretary Alex Azar, and former ORR Director Scott Lloyd.

immigration custody." *Id.* However, their children were designated unaccompanied minors and remained separated from their parents. In some cases, parents were deported without their children, and in other cases the Executive Branch officials made it increasingly difficult for parents to be reunited with their children. In addition to forcibly separating children, the Appellants allege that children were housed in detention centers where there were no beds, given deficient medical care and abused by detention workers.

The complaint also describes allegations made by the individual named Appellants. Specifically, K.O. and E.O. Jr., who are siblings, allege that they were separated from their mother after she was taken into criminal custody, indicted for illegal entry, and sentenced to time served after pleading guilty. They allege that after their mother was returned to civil immigration detention, they were not reunited with her; instead, they were taken to a different immigration facility where they faced physical abuse from the federal agents. The siblings were eventually released to their father on June 19, 2018. C.J., another named Appellant, alleges that he and his father, F.C., were detained by a U.S. Customs and Border Patrol ("CBP") agent and taken to a detention facility. According to the complaint, C.J and his father were kept in a very cold detention center and not given enough food to eat. On June 20, 2018, C.J. was separated from his father, and F.C. was taken to criminal court. Like K.O. and E.O. Jr.'s experience, once F.C. returned from criminal court he was not reunited with C.J. Instead, the family was separated for over a month, and according to the complaint, various federal agents asked F.C. if he wished to leave his son in the United States if he were deported. *Id.* at 64. F.C. and C.J. were finally reunited on July 26, 2018.

### B.    Procedural Background

On September 5, 2018, the Appellants filed their complaint in the District of Massachusetts. Appellants alleged that their constitutional rights were violated, and that the conduct of the Executive Branch officials violated 42 U.S.C. §§ 1985(3) and 1986.[2] The Executive Branch officials then filed a motion to dismiss, arguing that the Appellants failed to state a claim for relief and that venue was improper. On February 3, 2020, the Massachusetts District Court determined that venue was improper and transferred the case to the District of Columbia District Court ("District Court"). J.A. 219.

After the case was transferred, the District Court granted the Executive Branch officials' motion to dismiss for failure to state a claim. *K.O. v. U.S. Immigr. & Customs Enf't*, 468 F. Supp. 3d 350 (D.D.C. 2020). The Appellants' allegations fall into two categories: (1) a claim for damages against federal officials for violating the Appellants' constitutional rights (*i.e.* an implied

---

[2] The specific violations were as follows: violation of the Fourth Amendment protection against unlawful and unreasonable seizure (Count I), violation of substantive due process rights to family integrity (Count II), violation of procedural due process (Count III), violation of the Fifth Amendment guarantee of equal protection (Count IV), violation of substantive due process rights relating to the punishment of civil detainees (Count V), violation of the Due Process Clause of the Fifth Amendment in connection with coerced waiver of asylum and other immigration claims (Count VI), violation of substantive due process rights in connection with the failure to provide adequate mental health services (Count VII), conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985(3) (Count VIII), and refusal or neglect to prevent or aide in preventing conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1986 (Count IX).

cause of action under *Bivens* jurisprudence) and (2) a claim for damages for violating two statutory conspiracy provisions: 42 U.S.C. § 1985(3) and 42 U.S.C. § 1986. *See id.* at 363, 367. Beginning with the Appellants' constitutional claims, the District Court determined that a *Bivens* remedy was not applicable. *Id*. at 363–67. The District Court explained that under the two-step inquiry articulated by the Supreme Court in *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020), the Appellants' claims arose in a new context and special factors counseled against extending a *Bivens* remedy in this case. *K.O.*, 468 F. Supp. 3d at 363–67.

As for the Appellants' statutory claims, the District Court concluded that the Executive Branch officials were entitled to qualified immunity. *Id*. at 367–70. Section 1985(3) requires the Appellants to allege four elements including a conspiracy. *See* 42 U.S.C. § 1985(3); *Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009). Following the Supreme Court's decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017), the District Court determined that on the element of conspiracy, it was not well-established that officials within the Executive Branch engaged in a conspiracy when discussing a potential policy. *K.O.*, 468 F. Supp. 3d 368–70. Thus, the Executive Branch officials were entitled to qualified immunity. And because the Appellants' 42 U.S.C. § 1985(3) claim failed, the District Court determined that their claim under 42 U.S.C. § 1986 also failed. *Id*. at 370.

## II.

The court reviews *de novo* the grant of the Executive Branch officials' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Atherton*, 567 F.3d at 681, including the defense of qualified immunity, *see Youngbey v. March*, 676 F.3d 1114, 1117 (D.C. Cir. 2012). In considering a motion to dismiss, a court must accept the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### A. We Decline To Extend A *Bivens* Remedy To The Appellants' Claims

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court recognized an implied cause of action for damages for persons injured by federal officers who violated the Fourth Amendment's prohibition against unreasonable searches and seizures. *Id*. at 397. In the years following *Bivens*, the Supreme Court recognized implied rights of action for constitutional violations in two other contexts. *See Davis v. Passman*, 442 U.S. 228, 248–49 (1979) (recognizing a damages remedy for a gender discrimination claim against a Congressman under the equal protection component of the Fifth Amendment's Due Process Clause); *Carlson v. Green*, 446 U.S. 14, 23 (1980) (recognizing a damages remedy against federal prison officials for failure to provide adequate medical treatment under the Eighth Amendment's Cruel and Unusual Punishment Clause). However, since *Carlson* the Supreme Court has repeatedly refused to expand the *Bivens* remedy into a new context or category of defendants. *See Hernandez*, 140 S. Ct. at 742–43 (collecting cases).

In considering possible extensions of *Bivens*, a court must engage in a "two-step inquiry." *Id.* at 743. The court must first ask whether the request involves a claim that arises in a new context or involves a new category of defendants. *Id.* A context is new if "the case is different in a

4

meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Abbasi*, 137 S. Ct. at 1859. If a court determines the plaintiffs' allegations extend *Bivens* liability into a new context or category of defendants, the court must "proceed to the next step and ask whether there are factors that counsel hesitation" in granting a *Bivens* remedy. *Hernandez*, 140 S. Ct. at 744.

### i. The Appellants' Claims Arise In A New Context

The Supreme Court's understanding of a "new context" is broad, *id*. at 743, and a context may be regarded as new if it is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court," *Abbasi*, 137 S. Ct. at 1859. The first meaningful difference we identify is that this case arises in the context of immigration detention. *Bivens*, *Davis*, and *Carlson* may have dealt with violations of the Fourth, Fifth and Eighth Amendment, but none of these cases dealt with unreasonable seizures, discrimination, or inadequate medical attention as it relates to immigration detention. The Supreme Court's recent decision in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), underscores our new context analysis. In *Egbert*, the Supreme Court declined to recognize a *Bivens* action for damages against a CBP officer who allegedly used excessive force against a U.S. citizen because it determined that the plaintiff's claims, relating to immigration enforcement, arose in a new context as compared to previous *Bivens* actions. *Id*. at 1804. The Supreme Court's reasoning applies here too.

Second, the Appellants' claims implicate new defendants. The suit brings claims against, *inter alia*, various high-level officials including officials at the Department of Justice, CBP, ICE, ORR, DHS, HHS and advisors to the then-President. There is a meaningful difference between the Executive Branch officials and the federal narcotics agents in *Bivens*, the member of Congress in *Davis* and the federal prison officials in *Carlson*. *See, e.g. Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020) (finding a new context because the defendants were officials from the Office of the Currency Comptroller).

### ii. Special Factors Caution Against Extending *Bivens* In This Context

If a court determines the plaintiffs' allegations extend *Bivens* liability into a new context or category of defendants, the court must "proceed to the next step and ask whether there are factors that counsel hesitation" in granting a *Bivens* remedy. *Hernandez*, 140 S. Ct. at 744. Such factors can include separation of powers principles, national security, and the availability of other remedies for the alleged wrong. *Id*. at 747–49. This inquiry must also "concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857–58. The most important question guiding this analysis is, "who should decide whether to provide for a damages remedy, Congress or the courts?" *Hernandez*, 140 S. Ct. at 750 (internal quotation marks and citation omitted). "In most instances . . . the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability." *Loumiet*, 948 F.3d at 381 (alteration omitted).

For several reasons, we think the Court is not well suited to decide whether a damages remedy is available for the Appellants' claims. The Appellants' claims essentially call into question the reunification process and the policy decisions HHS and ORR have collaborated to create. In this

situation, the Judiciary is not well-suited to "consider and weigh the costs and benefits of allowing a damages action to proceed" for decisions related to child separation and child reunification. *Abbasi*, 137 S. Ct. at 1858. Furthermore, the Supreme Court has recently held that *Bivens* actions challenging immigration enforcement practices implicate national security, counseling hesitation. *Egbert*, 142 S. Ct. at 1805–06. Moreover, Congress has identified some of the harms caused by family separation and has provided $4 million in funding to HHS's Substance Abuse and Mental Health Services Administration to address the mental health needs of unaccompanied minors, with a focus on children who were separated from their families. *See* Department of Defenses and Labor, Health and Human Services, and Education Appropriation Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, 132 Stat. 2981 (2018). This appropriation of funding gives this Court caution before extending a *Bivens* remedy, because it seems that Congress is attempting to address the issue.

It is also quite significant that there are other remedies available to the Appellants. The alternative remedies inquiry in *Bivens* primarily asks whether the remedies available to the plaintiffs are "damages or nothing," *Abbasi*, 137 S. Ct. at 1862 (internal quotation marks and citation omitted), but that is not the case here. The Appellants could have filed an action seeking injunctive relief to end the practice of family separation, an Administrative Procedure Act (APA) petition seeking review of the policies of various executive agencies that led to the separation of families at the border, or Appellants could have plausibly sought habeas relief. Furthermore, this Court's precedent makes clear that "[t]he question is whether alternative remedies *exist*, not whether they cover the full breadth of harm that a would-be *Bivens* plaintiff alleges." *Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*, 881 F.3d 912, 921 (D.C. Cir. 2018) (emphasis added). Thus, the existence of other remedies, which would provide the principal relief the Appellants seek, counsels for this Court's hesitation in extending a *Bivens* remedy.

For all these reasons, we affirm the District Court's dismissal of the Appellants' constitutional claims seeking a damage remedy.

### B. The Appellants' Statutory Claims Fail Because The Executive Branch Officials Are Entitled To Qualified Immunity

The District Court not only declined to extend a *Bivens* remedy to the Appellants' constitutional claims, it also found that the Appellants' statutory claims failed, given that the Executive Branch officials were entitled to qualified immunity. *K.O.*, 468 F. Supp. 3d at 367–70. We agree.

The Appellants alleged violations of 42 U.S.C §§ 1985(3) and 1986. To plead a section 1985(3) claim the plaintiff must allege that the defendants did "(1) conspire or go in disguise on the highway or on the premises of another (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. It must then assert that one or more of the conspirators (3) did, or caused to be done, any act in furtherance of the object of [the] conspiracy, whereby another was (4a) injured in his person of property or (4b) deprived of having and exercising any right or privilege of a citizen of the United States." *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971) (internal quotation marks omitted). Thus, section 1985(3) "provides a cause of action

against two or more persons who participate in a conspiracy motivated by class-based discriminatory animus." *Atherton*, 567 F.3d at 688. Section 1986 provides a cause of action against anyone who has "knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of [the same] title, are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do." 42 U.S.C. § 1986. This means that a colorable claim under section 1985 is a prerequisite to a claim under section 1986. Therefore, we first focus on the Appellants' section 1985(3) claim.

The Appellants contend that the Executive Branch officials were engaged in a conspiracy to violate migrants' Fourth Amendment and Fifth Amendment rights. However, the Executive Branch officials asserted a qualified immunity defense. Mot. Dismiss Mem. at 40–42; Defs.' Supp. at 14–15. "An official who asserts a qualified immunity defense can only be held liable if the plaintiff establishes that the official violated a constitutional right that was clearly established at the time." *Lash v. Lemke*, 786 F.3d 1, 5 (D.C. Cir. 2015). Courts have "discretion to decide which of the two prongs of [the] qualified-immunity analysis to tackle first." *Id.* (cleaned up). Determining that a constitutional right exists and has been abridged by official conduct is not only difficult at times, but asks much of a court that should resolve matters on constitutional grounds only when there is no other way to do so. *See Pearson v. Callahan*, 555 U.S. 223, 241 (2009). In some cases, it is easier for a court to see that the claimed right, whether it exists or not, is by no means "clearly established." *Id.* at 237. "If the right in question was not clearly established, we need not [reach] the question of whether a constitutional violation occurred because the officers are entitled to qualified immunity regardless." *Dukore v. District of Columbia*, 799 F.3d 1137, 1144 (D.C. Cir. 2015). Thus, the question before us is whether it is clearly established that officials from various executive agencies can engage in a conspiracy to violate constitutional rights when enacting policies.

Fortunately for us, the Supreme Court addressed similar allegations in *Abbasi*. In *Abbasi*, the plaintiffs alleged that various officials from the Department of Justice engaged in a conspiracy to violate their civil rights. 137 S. Ct. at 1865. The Supreme Court began its analysis by observing a dispute among the lower courts regarding the applicability of the intra-corporate conspiracy doctrine, which recognizes that there is no unlawful conspiracy, within the meaning of 42 U.S.C § 1985, when officers within a single corporate entity consult among themselves and then adopt a policy for the entity. *Id.* at 1868 (citing discussion of the dispute in *Bowie v. Maddox*, 642 F.3d 1122, 1130–31 (D.C. Cir. 2011)). The Supreme Court did not rule on the applicability of the intra-corporate conspiracy doctrine; instead, it held that the defendant officials were entitled to qualified immunity because the division among lower courts "demonstrate[d] that the law on the point [was] not well established" and therefore "a reasonable official lack[ed] the notice required before imposing liability." *Id.* at 1868.

Like the Supreme Court in *Abbasi*, we too apply the qualified immunity analysis to the conspiracy element. And we hold that the Appellants failed to demonstrate it is clearly established in the law that officials in the Executive Branch, each answering to the same principal, can engage in a conspiracy among themselves and with their subordinates when communicating with each other about immigration policies. To be clear, the Appellants are not required to present a case directly on point for a right to be clearly established, but "for purposes of qualified immunity, existing precedent must have placed the statutory or constitutional question beyond debate."

7

*Hedgpeth v. Rahim*, 893 F.3d 802, 806 (D.C. Cir. 2018). Here, there is much uncertainty on applicability of the intra-corporate conspiracy doctrine. *See*, *e.g.*, *A.I.I.L. v. Sessions,* No. CV-19-00481, 2022 WL 997276, at *18 (D. Ariz. Mar. 31, 2022) (collecting cases). This Court's precedent places the burden on the Appellants to establish a consensus in the law; the Appellants have failed to meet that burden. Therefore, we hold that the Executive Branch officials are entitled to qualified immunity on the Appellants' section 1985(3) claims.

Finally, turning to the Appellants' 42 U.S.C § 1986 claim, we affirm the District Court's dismissal. As we have explained, for a section 1986 claim to succeed, the Appellants need to demonstrate a colorable claim under section 1985. Here, Appellants have not demonstrated that it was clearly established that the alleged conduct violated section 1985, and so their section 1986 claim is barred by qualified immunity as well.

\*     \*     \*

Consistent with the foregoing, we affirm the judgment of the District Court.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or petition for rehearing *en banc*. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41(a)(1).

**Per Curiam**

                **FOR THE COURT:**
                Mark J. Langer, Clerk

BY:    /s/
          Daniel J. Reidy
          Deputy Clerk

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Filed July 29, 2022

No. 20-5255

K.O., BY AND THROUGH THEIR PARENTS AND NEXT FRIENDS,
E.O. AND L.J., ET AL.,
APPELLANTS

v.

JEFFERSON B. SESSIONS, III, FORMER ATTORNEY GENERAL OF
THE UNITED STATES, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-00309)

---

SILBERMAN, *Senior Circuit Judge*, concurring:  I agree with the majority's holding, but I would include as a reason to deny a *Bivens* action that the plaintiffs in this case had an alternative remedy for damages under the Federal Tort Claims Act ("FTCA").  Indeed, they are pursuing such an action which makes their appeal for a *Bivens* action seem wholly superfluous.

To be sure, Appellants rely on *Carlson*, which held that *Bivens* actions, at least in that context, were not supplanted by a tort action authorized by the FTCA.  *Carlson v. Green*, 466

U.S. 14, 19–23 (1980). But I don't think that aspect of *Carlson* is any longer good law. *See Hernandez v. Mesa*, 140 S. Ct. 735, 748 n. 9 (2020). *Carlson* is limited to its facts—its reasoning doesn't survive. The majority ignores this point.

Expanding *Bivens* remedies is now a "'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (internal citation omitted). The Supreme Court has effectively made clear that the only occasions in which a damages remedy can be implied for a constitutional violation are those with the exact kind of facts that gave rise to three *Bivens* cases. *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971); *Davis v. Passman*, 442 U.S. 288 (1979); *Carlson v. Green*, 466 U.S. 14 (1980).

In theory—but only in theory—a court could imply a *Bivens* remedy in a "new context" (beyond the facts in *Bivens*, *Passman*, or *Carlson*), if there are no "special factors counseling hesitation." *Hernandez*, 140 S. Ct. at 743 (cleaned up). But one of the more obvious "special factors" in a new case is whether Congress has authorized *any* remedy for a particular alleged injury. *Egbert v. Boule*, 142 S. Ct. 1793, 1804 (2022).

That can include an injunctive remedy or even an APA claim. *See Ziglar*, 137 S. Ct. at 1862; *Egbert*, 142 S. Ct. at 1806. With that in mind, it seems obvious to me that a coinciding damages remedy authorized by the FTCA is *a fortiori* a special factor precluding a *Bivens* remedy and therefore that part of *Carlson*'s language should be ignored. This seems especially clear since courts are not supposed to supplement Congress's remedial structure with a *Bivens* claim simply because, in the courts' view, Congress did not do enough. *Egbert*, 142 S. Ct. at 1807.

Be that as it may, although the Court has announced that special factors should cause hesitation before extending a *Bivens* remedy to a new context, the truth of the matter is it has simply red-circled—to use a labor relations term—three *Bivens* cases. Those cases are limited to virtually the same factual situations.

To take a step back, in the *en banc* case, *Crawford-El v. Britton*, 93 F.3d 813, 832 (D.C. Cir. 1996) (Silberman, J., concurring) some years ago I urged the Supreme Court to overrule *Bivens* and reiterated the point in *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 252 (D.C. Cir. 2021) (Silberman, J., dissenting in part). It is in my view another egregious example of the Supreme Court of the United States acting like a common law court rather than an Article III court.[1] In that respect it is similar to *Roe v. Wade* or *New York Times v. Sullivan*. The Court has gone partway in the direction I urged.

The Clerk is directed to publish my concurring statement.

---

[1] Justices who have seen themselves as common law judges have come from both political parties.