PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1028
_____

ROLANDO MUNIZ,
                              Appellant

v.

UNITED STATES OF AMERICA; FEDERAL BUREAU
OF PRISONS; DR. ABIGAIL LOPEZ-DE LASALLE;
JOHN and JANE DOES
_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil No. 1:22-cv-00816
District Judge: Honorable Noel L. Hillman (Ret.)
_____

Argued: February 27, 2025

Before: RESTREPO, MONTGOMERY-REEVES, and
SCIRICA, *Circuit Judges*.

(Filed: August 13, 2025)

D. Dangaran [ARGUED]
Samuel Weiss
Rights Behind Bars
1800 M Street NW
Front 1 #33821
Washington, DC  20033
    *Counsel for Appellant*

John T. Stinson, Jr. [ARGUED]
Office of the United States Attorney
Camden Federal Building & Courthouse
401 Market Street
Camden, NJ  08101
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____


SCIRICA, *Circuit Judge*

    In limited contexts, the Supreme Court recognizes a cause of action against federal officers to redress a violation of constitutional rights. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971).  Rolando Muniz, a federal inmate, challenges the District Court's denial of a *Bivens* remedy for his Eighth Amendment deliberate indifference claim, arguing that his case is sufficiently analogous to the Supreme Court's decision in *Carlson v. Green*, 446 U.S. 14 (1980), that his claim should proceed. Because this Court's opinion in *Kalu v. Spaulding*, 113 F.4th

311 (3d Cir. 2024), held the availability of an alternative remedy creates a new context from *Carlson* and cautions against implying a new *Bivens* cause of action, we disagree. Muniz's *Bivens* claim cannot proceed because he had access to the Bureau of Prisons ("BOP") administrative remedial mechanism ("ARP").

Muniz also challenges the dismissal of his claim under the Rehabilitation Act, 29 U.S.C. § 794. But he concedes on appeal that his claim is barred by federal sovereign immunity. Accordingly, we will affirm.

## I. BACKGROUND[1]

Muniz is a federal inmate who, upon incarceration, was diagnosed with diabetes, treated with the drug Metformin, and offered soft-shoe and lower-bunk accommodations. In September 2018, Muniz was placed in Special Housing for a period exceeding ten months, where he alleges his food intake was substantially reduced. By June 2019, Muniz's A1C test indicated his blood sugar fell from highly diabetic to pre-diabetic, but he continued to be prescribed Metformin at a lower dosage.

In July 2019, Muniz was transferred to FCI Fairton, where Defendant Dr. Lopez de Lasalle, Muniz's new healthcare provider and the Medical Director of FCI Fairton, discontinued his Metformin prescription and diabetic

---

[1] Because this is an appeal of a motion to dismiss, we presume Plaintiff's non-conclusory allegations are true and recite them. *See Henry v. Essex Cnty.*, 113 F.4th 355, 359 (3d Cir. 2024).

3

accommodations based on the earlier, pre-diabetic reading. Muniz contested this action, contending the reading was an outlier based on his reduced food intake in Special Housing and that he still needed diabetic treatment. But Defendant Lopez refused Muniz's request to await a new blood report before denying him medication and accommodations.

In November 2019, Muniz's condition worsened—he developed diabetic blisters on his toe and began suppurating puss. Prison medical staff prescribed antibiotics and wound care, but Muniz did not consistently receive wound care due to staff shortages. Muniz's "wound got worse[,] suppurating 24 hours a day" and causing "extreme pain." AA 44.

On November 16, 2019, in "extreme agony," Muniz showed his unit officer his wounds and requested wound care. *Id.* Medical officials "refused to see [Muniz]" and told him to "come the next day." *Id.* The following day Muniz again sought treatment and was told to "come the next day." *Id.* Muniz alleges that "on both of these days . . . the medical [officer] falsely stated that [Muniz] had denied his scheduled wound care." *Id.*

Muniz was eventually seen by medical staff on November 18, 2019, and was taken to the emergency room, where he was prescribed antibiotics. On November 20, 2019, an MRI was taken which "revealed that [Muniz's] diabetic ulcers and infection had spread to the bone and that his toe had to be amputated." AA 45.

Muniz's toe was amputated on November 22, 2019. A blood test "later revealed" that Muniz's A1C "had incre[a]sed . . . and that he was fully diabetic." *Id.* Defendant Lopez

4

"finally agreed to restart [Muniz's] Metformin" on December 2, 2019. *Id*.

In October 2021, Muniz filed an administrative remedial claim for inadequate medical care with the BOP, which was denied for failure to sign. Muniz filed a corrected administrative claim with the BOP on December 28, 2021, and filed his Complaint in this action on February 15, 2022.

In his Complaint, Muniz brought an Eighth Amendment deliberate indifference *Bivens* claim against Defendants—Dr. Lopez De Lasalle and unnamed medical officials who denied him medical care. Muniz also brought statutory claims against Defendants, including a claim under the Rehabilitation Act.

The District Court screened Muniz's Complaint pursuant to 28 U.S.C. § 1915 and dismissed the Rehabilitation Act claim. Defendants then moved to dismiss Muniz's *Bivens* suit for failure to state a claim. The District Court granted the motion and dismissed the claim. In doing so, the District Court recognized Muniz's "allegations are very similar to *Carlson*." AA 15. But, under the first step of the *Bivens* analysis, the District Court reasoned that the case presented a new context because Muniz's injuries, unlike those in *Carlson*, were not fatal. Under the second step, the District Court reasoned that the BOP administrative remedial process was a special factor counseling against extending *Bivens* to this new context. Muniz timely appeals.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We

5

conduct plenary review of a district court's grant of a motion to dismiss. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "We affirm a district court's dismissal only if, accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff, we determine that the plaintiff is not entitled to relief under any reasonable reading of the complaint." *Kalu*, 113 F.4th at 325 (quotation omitted).

## III. DISCUSSION

### A. Context

American jurisprudence long recognized "every right, when withheld, must have a remedy, and every injury its proper redress." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 147 (1803). The doctrine is well-established in the common law. 3 William Blackstone, Commentaries *23 (1768) ("[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded."). It is a fundamental maxim of equity. 30A C.J.S. *Equity* § 132 (2024) ("Equity will not suffer a wrong to be without a remedy."). And it is deeply rooted.[2]

---

[2] *See* Mass. Const. and Declaration of Rights Art. XI (1780) ("Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs, which he may receive, in his person, property, or

Applying this principle, courts long "assumed common-law powers" to grant damages remedies in suits against federal officers. *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (quotation omitted).[3] But the landmark decision of *Erie R.R. Co. v. Tompkins* transformed our legal landscape—concluding

character."). The American colonists relied on common-law damages suits to challenge government officers who exceeded their authority. *See, e.g.*, *Erving v. Cradock*, Quincy Rep. 553 (Mass. 1761). When the Sugar and Stamp Acts restricted these causes of action and provided an alternative remedy in the Courts of Admiralty, the American Revolutionaries protested. *See Braintree Instructions* (1765), *in* 3 The Works of John Adams 465, 466–67 (Charles Francis Adams ed., Boston, Little, Brown & Co. 1851). And, after declaring independence, Revolutionaries asserted the availability of a legal remedy as a fundamental right. *See* Mass. Const. and Declaration of Rights Art. XI (1780); *cf.* Roger W. Kirst, *Administrative Penalties and the Civil Jury: The Supreme Court's Assault on the Seventh Amendment*, 126 U. Pa. L. Rev. 1281, 1325–29 (1978) (noting, during the Virginia and North Carolina ratification debates, John Marshall and James Iredell, among others, presumed common-law remedies against federal officers would supplement impeachment as a means to hold officers accountable under the U.S. Constitution).

[3] *Cf. Little v. Barreme*, 6 U.S. (2 Cranch) 170, 178 (1804); *Murray v. Schooner Charming Betsy* 6 U.S. (2 Cranch) 64, 125 (1804); *Wise v. Withers*, 7 U.S. (3 Cranch) 331, 337 (1806); *The Apollon*, 22 U.S. (9 Wheat.) 362, 367 (1824); *Elliott v. Swartwout*, 35 U.S. (10 Pet.) 137, 159 (1836); *Buck v. Colbath*, 70 U.S. (3 Wall.) 334, 347 (1866); *Belknap v. Schild*, 161 U.S. 10, 18 (1896).

"[t]here is no federal general common law." 304 U.S. 64, 78 (1938). "With the demise of federal general common law, a federal court's authority to recognize a damages remedy," *Hernandez v. Mesa*, 589 U.S. 93, 101 (2020), was "at best, uncertain," *Egbert*, 596 U.S. at 491. Nevertheless, in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, the Supreme Court permitted a damages claim to proceed against federal agents for an unreasonable search and seizure in violation of the Fourth Amendment. 403 U.S. at 397. And at least one Justice suggested the continued authority to grant such restitutionary remedies rests upon the Court's "inherent equitable powers." *Id.* at 404 (Harlan, J., concurring) (quotation omitted); *see also id.* at 408 n.8.

The *Bivens* doctrine—the ability of the Court to imply a damages cause of action for a constitutional wrong—was later extended by the Supreme Court to two other contexts. *See Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980). But, in 1981, Congress passed the Westfall Act, 28 U.S.C. § 2679, limiting common-law suits against federal officers and making "the Federal Tort Claims Act (FTCA) the exclusive remedy for most claims against Government employees arising out of their official conduct." *Hernandez*, 589 U.S. at 111 (quotation omitted). The Act still permitted claims "brought for a violation of the Constitution." 28 U.S.C. § 2679(b)(2)(A). And, by implicitly recognizing actions for constitutional violations, "Congress accepted the [] private cause of action as then defined but chose to extend it no further." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 166 (2008) (discussing implied remedies in a different context). Thus, the Westfall Act "left *Bivens* where it found it" but granted no "license to create a new *Bivens* remedy." *Hernandez*, 589 U.S. at 111 n.9.

Since then, we recognize a "tension between judicially created causes of action and the Constitution's separation of legislative and judicial power." *Egbert*, 596 U.S. at 491 (quotation omitted). The Court now views "creating a cause of action [a]s a legislative endeavor." *Id.* And it has discarded implied actions as relics of an "*ancien regime*," *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017) (quotation omitted), suggesting "if [it] were called to decide *Bivens* today, [it] would decline to discover any implied causes of action," *Egbert*, 596 U.S. at 502. But the Court has not "dispense[d] with *Bivens* altogether." *Id.* at 491.

**B. Legal Standard**

Today, "the Supreme Court has set forth a two-step inquiry to determine the availability of *Bivens* remedies in a particular case." *Kalu*, 113 F.4th at 326. "First, we ask whether the case presents a new *Bivens* context—i.e., whether the case is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court." *Id.* (cleaned up). There are only three such cases: *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (federal law enforcement officer violated the Fourth Amendment through an unreasonable search and seizure in a person's home); *Davis v. Passman*, 442 U.S. 228 (1979) (congressman terminated staffer on the basis of sex unlawfully discriminating under the Fifth Amendment); *Carlson v. Green*, 446 U.S. 14 (1980) (prison officials fail to provide medical attention in response to prisoner's asthma attack leading to death and constituting deliberate indifference to medical needs in contravention of the Eighth Amendment). "If a case does not present a new *Bivens* context, the inquiry ends there, and a *Bivens* remedy is available." *Kalu*, 113 F.4th at 326 (quotation

9

omitted).

"[I]f the case presents a new context, we proceed to the second step of the inquiry and ask whether there are 'special factors counselling hesitation' in extending *Bivens*."  *Id.* (quoting *Abbasi*, 582 U.S. at 136).  We decline to infer a cause of action when these factors "indicat[e] that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed."  *Goldey v. Fields*, 145 S. Ct. 2613, 2615 (2025) (quotation omitted).

But, in *Egbert v. Boule*, the Supreme Court clarified that "a new context arises" even under the first step when "potential special factors that previous *Bivens* cases did not consider" are presented and those factors "counsel hesitation"—extending a step-two-like special factors analysis to the first step.  596 U.S. at 492–93 (cleaned up).  There, the Court declined to extend *Bivens* in a case where a "federal law enforcement officer violated the Fourth Amendment in searching the curtilage of [an individual's] home," much like in *Bivens*, on the grounds that search in *Egbert* was proximate to the border, raising immigration and national security concerns as special factors not previously considered in *Bivens*.  *Id.* at 503 (Gorsuch, J., concurring); *see id.* at 495–96 (majority opinion).  In holding a *Bivens* remedy is unavailable in cases which "present 'almost parallel circumstances' or a similar 'mechanism of injury'" to an existing context, *id.* at 495 (citation omitted), the Court explained "[w]hile our cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy," *id.* at 492.

10

"*Egbert* tightened the [pre-existing] *Ziglar* test and, in doing so, made a strong statement that lower courts should not extend *Bivens* beyond the contexts recognized in *Bivens*, *Davis*, and *Carlson*." *Fisher v. Hollingsworth*, 115 F.4th 197, 204 (3d Cir. 2024).

## C. The Availability of an Alternative Remedy Forecloses *Bivens* Relief Here

### a. Only the Seventh *Abbasi* Factor Presents a New Context

Under the first step, if a claim is "sufficiently similar" to *Carlson*, then "the inquiry ends there, and a *Bivens* remedy is available." *Kalu*, 113 F.4th at 326–27. We use the Supreme Court's *Abbasi* factors to determine "differences that are meaningful enough to make a given context a new one." *Id.* at 326 (quoting *Abbasi*, 582 U.S. at 139–40). Here, the first six enumerated factors do not proffer meaningful differences from *Carlson*. But the Supreme Court and this Circuit have stressed that these factors are non-exhaustive. *Id.* And, therefore, the final factor—"the presence of potential special factors that previous *Bivens* cases did not consider"—is relevant. *Abbasi*, 582 U.S. at 140. As for the other six factors, they are not dispositive:

### i. The Rank of the Officers Involved

Muniz brings his claim against the chief medical officer and treating medical practitioners at FCI Fairton. This is the same rank/titles of the defendants in *Carlson*. *See Green v. Carlson*, 581 F.2d 669, 671 (7th Cir. 1978).

11

## ii. The Constitutional Right at Issue

Muniz's claim raises the same constitutional right as that in *Carlson*: "a federal prisoner's Eighth Amendment claim for failure to provide adequate medical treatment." *Hernandez*, 589 U.S. at 99 (characterizing *Carlson v. Green*, 446 U.S. 14 (1980)).

## iii. The Generality or Specificity of the Official Action

Defendants suggest the official action here differs from *Carlson* because Muniz's injuries did not arise from emergent circumstances and were unlikely to be fatal. But the medical circumstances causing the injuries to Muniz are "sufficiently similar" to those experienced in *Carlson*. *Kalu*, 113 F.4th at 327. There, the inmate's alleged his injuries arose, in part, because "he was not given proper medication," "did not receive the steroid treatments," and was not granted facility-transfer accommodations for his asthmatic condition. *Green*, 581 F.2d at 671. Similarly, here, Muniz alleges his injuries arose because he was denied medications, treatments, and accommodations necessary to address his diabetic condition. Furthermore, both the *Carlson* plaintiff and Muniz allege these denials of adequate care resulted in flare-ups of their medical conditions, necessitating a hospital visit and emergency medical treatment. *Green*, 581 F.2d at 671. Accordingly, the medical circumstances leading to Muniz's harm do not provide any meaningful difference to suggest this case arises in a new context from *Carlson*.

It is true that the injuries in *Carlson* were fatal, meanwhile those faced by Muniz were not. But, when looking at special factors, we ask whether "the case is different in a

12

meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Abbasi*, 582 U.S. at 139. It is unclear why the difference between amputation and death is "meaningful," i.e., provides a "reason to think Congress might doubt the efficacy or necessity of a damages remedy" in this context. *Egbert*, 596 U.S. at 491 (quotation omitted). Indeed, this difference neither provides insight into congressional intent nor meaningfully changes the remedial analysis the Supreme Court already undertook in *Carlson*.

On the issue of fatality, we find our sister circuit persuasive that this "difference in degree is not a meaningful difference giving rise to a new context," *Stanard v. Dy*, 88 F.4th 811, 817 (9th Cir. 2023), and therefore, "plaintiff need not suffer death or a life-threatening injury for his claim to be sufficiently analogous to *Carlson*," *Watanabe v. Derr*, 115 F.4th 1034, 1041 (9th Cir. 2024).

> iv. *The Extent of Judicial Guidance as to How an Officer Should Respond to the Problem or Emergency to Be Confronted*

Here, Defendants were put on notice by *Carlson v. Green*, 446 U.S. 14 (1980), and *Estelle v. Gamble*, 429 U.S. 97 (1976), that the Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide medical treatment to incarcerated inmates. And this Circuit has recognized that failure to provide blood-sugar-regulating medication to an inmate can, in certain circumstances, constitute deliberate indifference to medical needs. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582–83 (3d Cir. 2003). At the very least, "judicial guidance as to how a [BOP]

13

officer should respond to an inmate's serious medical condition is significantly more developed than it was in *Carlson*." *Watanabe*, 115 F.4th at 1039.

### v. The Statutory or Other Legal Mandate Under Which the Officer was Operating

"[T]he statutory or other legal mandate under which the officer was operating is the same here as in *Carlson*, as both sets of defendants were operating as BOP medical staff." *Watanabe*, 115 F.4th at 1040 (cleaned up); *see also Carlson*, 446 U.S. at 16 n.1.

### vi. The Risk of Disruptive Intrusion by the Judiciary into the Functioning of Other Branches

Except as to alternative remedies, which is better discussed under the seventh factor, this "case does not present a risk of intrusion by the judiciary into the operations of the BOP any more than what *Carlson* already permits." *Watanabe*, 115 F.4th at 1040.

### b. This Case Presents a New Context Because the BOP ARP Is a Special Factor Not Considered in *Carlson*

The seventh *Abbasi* factor is "the presence of potential special factors that previous *Bivens* cases did not consider." *Abbasi*, 582 U.S. at 140; *see also Egbert*, 596 U.S. at 492–93 (reaffirming "a new context arises" under the first step when "potential special factors that previous *Bivens* cases did not consider" are presented and those factors "counsel hesitation"). "[The] Court has not defined the phrase 'special factors

14

counselling hesitation.' The necessary inference, though, is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 582 U.S. at 136 (citation omitted). Thus, the Supreme Court explains: "While our cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 596 U.S. at 492.

One special factor is "[i]f there are alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" *Egbert*, 596 U.S. at 493 (citation omitted). Thus, "*Bivens* relief [i]s unavailable" when "federal prisoners c[an], among other options, file grievances through an 'Administrative Remedy Program.'" *Id.* at 497 (characterizing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). And this special factor creates a new context even when "the right at issue [i]s the same" and "the mechanism of injury [i]s the same: failure to provide adequate medical treatment." *Abbasi*, 582 U.S. at 139 (characterizing *Malesko*, 534 U.S. at 64); *see also id.* at 148 (noting "the existence of alternative remedies" can constitute "features that were not considered in the Court's previous *Bivens* cases").

Here, Muniz was able to take advantage of an alternative remedial mechanism, the BOP ARP. As this Court noted in *Kalu*, the BOP ARP creates a new context at step one of the *Bivens* inquiry:

Kalu's claim presents "features that were not considered" by the Supreme Court when deciding *Carlson*. . . . [A]t the time, the BOP's remedy program was not in existence. Thus, in *Carlson*, there was no explicit congressional declaration that persons injured by federal officers' violations of the Eighth Amendment could not recover money damages from the agents but had to be remitted to another remedy, equally effective in the view of Congress. That situation bears little resemblance to Kalu's case where Congress, through the PLRA, has enacted legislation to address prisoners' lawsuits, and where the BOP's ARP provides inmates with an alternative avenue for relief. Because the PLRA and the BOP's remedy program are "features that were not considered" by the Supreme Court when it decided *Carlson*, they present an additional reason to conclude that Kalu's claim arises in a new context.

*Kalu*, 113 F.4th at 327–28 (cleaned up). Since the BOP ARP did not factor into the Supreme Court's remedial analysis in *Carlson*, the availability of that mechanism to Muniz creates a new context at the first step.[4]

---

[4] Since our decision in *Kalu*, a circuit split has arisen on this issue. At least one circuit agrees with our first-step analysis. *See Johnson v. Terry*, 119 F.4th 840, 858–59 (11th Cir. 2024). But others have come to differing conclusions. *See Watanabe*, 115 F.4th at 1042; *cf. Brooks v. Richardson*, 131 F.4th 613, 616 (7th Cir. 2025).

16

c. The BOP ARP Counsels Against Extending *Bivens*

In addition to creating a new context at step one, the BOP ARP "foreclose[s] the need to fashion a new, judicially crafted cause of action" at the second step as well. *Kalu*, 113 F.4th at 346 (quoting *Malesko*, 534 U.S. at 68).

The effectiveness of the BOP ARP is, at best, dubious. *See id.* at 347 (Restrepo, J., concurring). But, in the step-two *Bivens* analysis, alternative remedies need not "provide complete relief." *Egbert*, 596 U.S. at 493 (quoting *Bush v. Lucas*, 462 U.S. 367, 388 (1983)). The Court's jurisprudence cautions against the judiciary weighing the adequacy of alternative relief established by the political branches. *See Goldey*, 145 S. Ct. at 2615. Rather, so long as "Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure," *Egbert*, 596 U.S. at 493 (quotation omitted), then "bedrock principles of separation of powers foreclose[] judicial imposition of a new substantive liability," *Malesko*, 534 U.S. at 69.

Thus, at the second step, the availability of the BOP ARP is a "special factor[]" suggesting that a damages remedy "risk[s] . . . interfering with the authority of the other branches." *Hernandez*, 589 U.S. at 102. And this reason to hesitate, alone, forecloses *Bivens* relief. *See Egbert*, 596 U.S. at 496. At bottom, Muniz's *Bivens* claim fails because an alternative remedy existed and was made available to him.

d. Denying Muniz's *Bivens* Claim Does Not Preclude All *Carlson* Relief

Appellant argues applying *Egbert*'s alternative remedial

17

analysis to foreclose Muniz's action would functionally overrule *Carlson* "sub silentio." But this is not so.

The availability of the BOP ARP is a meaningful difference that distinguishes *this case* from *Carlson*. But, notwithstanding the BOP ARP's existence, *Carlson* relief remains available to inmates in limited circumstances. For instance, should "prison administrators thwart inmates from taking advantage" of the ARP, "such interference . . . renders the administrative process unavailable" as a remedy. *Ross v. Blake*, 578 U.S. 632, 644 (2016).[5] Here, unlike those circumstances, "[P]laintiff had an avenue for some redress" and availed himself of the BOP ARP. *Malesko*, 534 U.S. at 69. And, since Muniz "ha[d] full access to remedial mechanisms established by the BOP," his *Bivens* claim is foreclosed. *Id.* at 74.

Nevertheless, the first-step inquiry adopted in *Egbert*

---

[5] The mere existence of the BOP ARP cannot meaningfully distinguish the remedial analysis here from that in *Carlson* if the availability of that administrative remedy is not also taken into account. When *Carlson* was decided in 1980, the BOP ARP had already been established the year prior. *See* Administrative Remedy Program, 44 Fed. Reg. 62,250 (Oct. 29, 1979). But the inmate in *Carlson* was injured in 1975—long before the BOP ARP was in existence. *See Green*, 581 F.2d at 671. Thus, because the inmate in *Carlson* was unable to avail himself of the BOP ARP, the availability of this administrative remedy did not factor into the Supreme Court's remedial analysis in *Carlson* but is nevertheless relevant to our remedial analysis today.

18

does limit the availability of some relief previously cognizable under *Carlson*. But this is hardly surprising considering the Supreme Court's cautionary language. *See Egbert*, 596 U.S. at 492 (noting *Bivens* relief will be unavailable "in most every case"); *cf. id.* at 504 (Gorsuch, J., concurring) ("[I]f the only question is whether a court is 'better equipped' than Congress to weigh the value of a new cause of action, surely the right answer will always be no.").

### D. Muniz's Rehabilitation Act Claim Is Barred by Sovereign Immunity

Muniz also brought a Rehabilitation Act claim but concedes on appeal his claim is barred by sovereign immunity because Muniz only sought money damages, not injunctive relief, in his Complaint. Section 504 of the Rehabilitation Act does not waive sovereign immunity for damages claims against the federal government. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Accordingly, the District Court was correct to dismiss Muniz's Rehabilitation Act claim. But such a dismissal is without prejudice. *See Aldossari ex rel Aldossari v. Ripp*, 49 F.4th 236, 262 (3d Cir. 2022) (noting a dismissal is without prejudice when the court lacks subject matter jurisdiction).

### IV. CONCLUSION

The Supreme Court recently "made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." *Goldey*, 145 S. Ct. at 2614 (quoting *Egbert*, 596 U.S. at 486). This case does not present that unusual circumstance. For the reasons set forth above, we will affirm the District Court's Order of December 7, 2023.

19

**RESTREPO**, *Circuit Judge*, concurring:

Because our binding precedent in *Kalu v. Spaulding*, 113 F.4th 311 (3d Cir. 2024), requires us to consider alternative remedial structures as a special factor at step one of the test established by the Supreme Court in *Egbert v. Boule*, 596 U.S. 482 (2022), I agree with the majority that the District Court's opinion must be affirmed. I write separately from the majority's well-reasoned opinion, however, to highlight the different and superior approach taken by the Seventh, Ninth, and Tenth Circuits in *Brooks v. Richardson*, 131 F.4th 613 (7th Cir. 2025), *Watanabe v. Derr*, 115 F.4th 1034 (9th Cir. 2024), and *Rowland v. Matevousian*, 121 F.4th 1237 (10th Cir. 2024).

In *Kalu*, we determined that "[b]ecause the [Prison Litigation Reform Act] and the [Bureau of Prisons'] remedy program are 'features that were not considered' by the Supreme Court when it decided *Carlson* [*v. Green*, 446 U.S. 14 (1980)], they present an additional reason to conclude that [a prisoner's *Carlson*] claim arises in a new context." *Kalu*, 113 F.4th at 328 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 148 (2017)). This holding was consistent with the approach taken in *Abbasi*, where the Court considered "the existence of alternative remedies" as a potential "feature[] that w[as] not considered in the Court's previous *Bivens* cases and that might discourage a court from authorizing a *Bivens* remedy." *Abbasi*, 582 U.S. at 148.

However, as we recognized in *Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024), *Egbert* "modified," *id.* at 205, the Court's approach in *Abbasi* and now controls our analysis of claims brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

1

One way in which *Egbert* modified *Abbasi* was in its consideration of alternative remedial structures.  In *Egbert*, the Court discussed alternative remedial structures only at step two of its analysis, in evaluating whether a court should "fashion a *Bivens* remedy," and "infer a new *Bivens* cause of action." 596 U.S. at 493 (quoting *Abbasi*, 582 U.S. at 137).  Such considerations were notably absent from the Court's extensive articulation of the first step of its test.  The Court again considered alternative remedial structures at step two in *Goldey v. Fields*, but did not discuss or reconsider the step one analysis featured in *Egbert*.  606 U.S. __, 2025 WL 1787625, at *2 (U.S. June 30, 2025).

In *Watanabe*, the Ninth Circuit followed *Egbert* and held that "alternative remedial structures can be one 'special factor,' to be considered at the *second* step of the *Bivens* analysis."  115 F.4th at 1042 (citing *Egbert*, 596 U.S. at 493, 498).  Accordingly, the Ninth Circuit concluded that "the existence of alternative remedial structures within the BOP" did not present a new context at step one of the *Egbert* test for a claim brought pursuant to *Carlson*.  *Id.*

The Tenth Circuit took a similar approach in *Rowland*, where it applied the two-step *Egbert* test in reviewing a prisoner's *Carlson* claim.  121 F.4th at 1243.  Despite engaging in a lengthy analysis at step one, the Tenth Circuit only considered the availability of "alternative remedial schemes" at step two of the *Egbert* test.  *Id.*  Likewise, in *Brooks*, the Seventh Circuit held that a plaintiff's *Carlson* claim did "not present a new context" at step one of the *Egbert* test without any consideration of alternative remedial structures.  131 F.4th at 616.

2

The approach taken by the Seventh, Ninth, and Tenth Circuits is a more accurate interpretation of *Egbert* than ours in *Kalu*. But because *Kalu* is binding precedent and controls the outcome of this case, I am compelled to concur with the judgment.